C. D. KUKUK, Defendant in Error, *vs.* WILLIS A. MARTIN *et al.* Plaintiffs in Error.

*Opinion filed October 25, 1928.*

WOODWARD, HIBBS & POOL, for plaintiffs in error.

FRED B. SHEARER, (CHARLES B. DICKERSON, of counsel,) for defendant in error.

Mr. JUSTICE HEARD delivered the opinion of the court:

This cause is here by leave of this court on *certiorari* to review a judgment of the Appellate Court for the Second District reversing and remanding, with directions, a decree of the circuit court of LaSalle county dismissing

for want of equity a bill filed in that court by defendant in error against plaintiffs in error, seeking to enforce an alleged equitable lien on the proceeds of a number of hogs sold by plaintiffs in error as trustees for one Kelley.

The evidence shows that Charles C. Kelley, residing on a farm near Earlville, was engaged in farming and buying and selling livestock. In October, 1920, he contracted for the purchase of 108 hogs. They were shipped by railroad to Earlville, to be paid for before delivery. Kelley had given a check to the seller but it was not honored by the bank on account of lack of funds, and the seller notified the railroad agent not to deliver the hogs until the check was made good. On October 6, 1920, Kelley applied to defendant in error to sign a note for $1500. With reference to this transaction defendant in error testified: "Around October 6 Kelley called me one night and wanted to see me and said he was in trouble. He said he had bought 108 hogs at a sale and gave a check for it and the bank turned his check down and they stopped him from unloading the hogs. The hogs at that time were on the Northwestern tracks, at Earlville. He said there was a man down there who said that if he would give him a note with a signer everything would be all right. He asked me if I would sign the note. I told him no; I was taking too many chances. He said, 'I will turn the hogs over to you,' and I told him I could not take the stock because I did not have the room or feed. 'Well,' he says, 'you won't take any chances; this note is eight months; you sign this note and the hogs are yours and I will take them home and feed them, and when they are fat you sell them, pay the note and interest and give me what is left.' I said, 'Under those conditions, Charles, I will sign this note,' and I signed it." The note was signed by defendant in error and the hogs were turned over to Kelley. Being hard pressed by his creditors, on March 4, 1921, Kelley made an assignment of all of his property for the benefit of all of his

creditors who might want to join therein, to A. J. Foote, who was president of the Earlville National Bank, and Willis A. Martin, who was president of the First National Bank of Earlville. Kelley turned over to his assignees and trustees all of his property, including 85 hogs.

Defendant in error testified that in April, 1921, a day or two before the sale of Kelley's property by plaintiffs in error, he went to the Earlville National Bank to see Foote. Foote was not there but he talked with W. C. Gilmore, the cashier of the bank, and told Gilmore that he had a claim on these hogs. He further testified that Gilmore told him to let the sale go on without stirring up any of the creditors; that he (Gilmore) would look after the interests of defendant in error and would see that everything was made all right—that he would assure defendant in error he would get eighty per cent of his claim; that this method would be cheaper than collecting it by law; that Gilmore said: "I am looking after your interests; I am looking after my friends, and I don't care if the rest ever get any money." Defendant in error's testimony as to his conversation with Gilmore was objected to. Gilmore was not shown by the evidence to have been an agent of plaintiffs in error or to have had any connection with the transaction other than clerking at the sale for a part of the time. The bank of which he was cashier was not one of the creditors. Defendant in error further testified that as he left the bank after this talk with Gilmore he met Foote on the sidewalk just outside of the bank; that he related to Foote his conversation with Gilmore, and Foote said, "Yes, that is the best thing;" that Foote asked him to sign the assignment agreement as a creditor of Kelley, but he refused to do it, and that in a prior conversation with Foote he told him that the hogs were his. Foote in his testimony denied that he had any conversation with defendant in error in April, 1921, at the time and place stated by defendant in error; that the first time he had a conversation with him about

the hogs was in January, 1922, after the sale; that in that conversation defendant in error claimed that the hogs were his; that prior to that time he did not know he made any claim to the hogs.

The hogs were sold on April 6, 1921. Alfred Leonard, who had worked for Kelley, testified that on the day of the sale he had a conversation with Kelley in which Kelley said, "There are some of the Kukuk hogs; haven't they done fine?" The evidence of this conversation was received subject to plaintiffs in error's objection.

The evidence shows that the 85 hogs were sold for $1409.70. On January 5, 1922, the Farmers State Bank of Belvidere obtained a judgment by confession on the note signed by Kelley and defendant in error. Later Kelley died and defendant in error satisfied the judgment and costs by paying $1577.43. He also paid $116 interest prior to the judgment.

It is contended by plaintiffs in error, among other things, that defendant in error did not acquire an equitable lien on the 108 hogs by the transaction with Kelley; that the court erred in admitting the testimony with reference to the conversation between defendant in error and Gilmore and between Leonard and Kelley. The consideration of these questions is not necessary to a determination of this cause. An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. It is not a *jus in re* or a *jus ad rem*. It is neither a debt nor a right of property but a remedy for a debt. It is simply a right of a special nature over the property which constitutes a charge or encumbrance thereon, so that the very property itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists. (*Aldrich* v. *Ederer Co.* 302 Ill. 391.) The remedies of equity are, as a class, specific. The doctrine

of "equitable liens" was introduced for the sole purpose of furnishing a ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. In a large class of executory contracts, express and implied, which the law regards as creating no property right or interest analogous to property but only a mere personal right and obligation, equity recognizes, in addition to the personal obligation, a peculiar right over the thing concerning which the contract deals, which it calls a "lien," and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing and to enforce the defendant's obligation by a remedy which operates directly upon that thing. Pomeroy's Eq. Jur. (4th ed.) p. 2961.

The basis of defendant in error's bill in this case is an alleged claim for an equitable lien upon 108 hogs, and a decree therefor can only be sustained if it operates directly upon the identical 108 hogs or a part thereof or the proceeds thereof. In enforcing an equitable lien a court of equity does not supply a remedy for a creditor against a debtor by acting upon property of the debtor, or the proceeds thereof, other than that upon which the equitable lien existed. In the instant case there is no evidence whatever which shows that the 85 hogs sold by plaintiffs in error were a part of the 108 hogs in question. Defendant in error did not see the hogs while they were in the possession of the railroad company nor when they were turned over to Kelley. He testified: "I did not see the hogs. Kelley told me they were a variety—from old sows to fall pigs. I don't know how many sows there were or how many pigs. The only thing I know is that the car-load consisted of various kinds and grades of sows and pigs. I was present at the sale and saw some hogs sold. I didn't know that the hogs sold at the sale were the ones I got in the car." He was asked this question: "The hogs that you claimed to Mr. Foote—

that you have testified about prior to the sale—were they your hogs?" and answered: "Just enough on that claim; no particular hogs; just enough—I just claim enough to pay the note." Leonard did not testify that the hogs concerning which he had a conversation with Kelley on the day of the sale were hogs which were sold at the sale. The evidence shows that when Kelley bought hogs he separated them into different pens according to their weights; that there was no grouping of 108 hogs that were kept separate and apart on the farm from the other hogs; that Kelley shipped by railroad a car of hogs each week, and sometimes two; that during the fall and winter of 1920 and 1921 Kelley shipped at least 500 hogs; that when he was about to ship a car-load of hogs he would pick out for shipment the choicest hogs which he had on the premises.

This case is entirely different in its facts from the case of *Union Trust Co.* v. *Trumbull,* 137 Ill. 146, which involved a construction of the Public Warehouse act of 1871 and warehouse receipts purporting to have been issued in accordance with the provisions of that act. In that case the warehouse receipts which were the basis of the equitable lien were fraudulently issued, and the property covered by them, though fraudulently commingled with other like property of the lienor upon which like fraudulent certificates had been issued, was, at the time the lien was sought to be enforced, in the possession of a volunteer assignee of the lienor. Assuming that defendant in error had an equitable lien upon the 108 hogs turned over by the railroad company to Kelley, (upon which question we express no opinion,) yet in a court of chancery, in enforcing an equitable lien, the very thing itself upon which the lien exists must be proceeded against and either sold or sequestered under a judicial decree. To entitle defendant in error to a decree in his favor it was incumbent upon him to prove that the 85 hogs sold by plaintiffs in error were a part of the 108 hogs, and having entirely failed to make such proof

608

the chancellor was fully justified in dismissing his bill for want of equity.

The judgment of the Appellate Court is reversed and the decree of the circuit court affirmed.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*