Ernest E. Freeman and Lommen D. Eley, Administrator De Bonis Non with the Will Annexed of the Estate of Walter W. Freeman, Deceased, Appellees, v. Equitable Life Assurance Society of the United States, Appellee. Mary Freeman et al., Appellants.

## Gen. No. 40,933.

Heard in the third division of this court for the first district at the October term, 1939. Opinion filed April 10, 1940.

FREDERICK A. BROWN, ROSS LANGDON and CHAS. O. RUNDALL, all of Chicago, for appellants; DANIEL F. KEMP, of Chicago, of counsel.

LEONARD & LEONARD, of Chicago, for certain appellee; GORDON MCLEISH LEONARD, of counsel.

DICKINSON, SPROWL, NORVILLE & JAMES, of Chicago, for certain other appellee; GEORGE F. JAMES and EDWARD WENDROW, of Chicago, of counsel.

MR. JUSTICE HEBEL delievered the opinion of the court.

This is an appeal by the defendants from a decree of the superior court entered in a suit in equity holding that the plaintiff Ernest E. Freeman is entitled to the proceeds of $30,000 of the life insurance on the life of plaintiff's brother, Walter W. Freeman, and against the widow and children of the deceased, to whom the policies were payable, and the Equitable Life Assurance Society of the United States. This cause was referred to a master to hear evidence and report his conclusions of fact, but not of law.

The amended bill of complaint charges that Walter W. Freeman, since deceased, entered into a contract with his brother, Ernest E. Freeman, which contract is set out in the complaint and shows that a syndicate was formed consisting of Walter W. Freeman, Ernest E. Freeman and others for the purchase of $573,840 of Chicago Street Assessment Bonds; that the plaintiff Ernest E. Freeman was to contribute $30,000 on April 15, 1936. The agreement further provided that Ernest E. Freeman shall be secured by Walter W. Freeman "against loss of his contribution of $30,000 or any part thereof. The said Walter W. Freeman hereby under-takes and agrees to provide said Ernest E. Freeman with life insurance on the life of said Walter W. Freeman in life insurance companies satisfactory to said Ernest E. Freeman in the sum of $30,000, the policy or policies . . . to be delivered to Ernest E. Freeman and to be so written or endorsed as to make the same payable to Ernest E. Freeman in the event of the death of said Walter W. Freeman."

Plaintiff's amended complaint recites the existence of certain life insurance policies and specifically policies aggregating $30,000 issued by the Equitable Life Assurance Company of the United States; that to secure plaintiff the return of his contribution toward a joint venture, Walter W. Freeman promised to assign and deliver "certain of the aforementioned policies of life insurance upon the life of the said Walter W. Freeman in the amount of $30,000 to said plaintiff." The amended complaint further recites the contribution of $30,000 and the failure of Walter W. Freeman to deliver the insurance. .

The amended complaint prayed (1) that answer be required; (2) that Equitable Life Assurance Society of the United States be enjoined from paying out moneys under its policies; (3) for specific performance of the contract; (4) for the declaration, establishment and foreclosure of an equitable lien upon the policies of life insurance to the extent of $30,000; (5) for a money decree against Equitable Life Assurance Society in the sum of $30,000; (6) for a money decree against the widow and children to the extent of $30,000 with costs; (7) that the court impose a constructive trust upon the policies of insurance or the proceeds; (8) for an injunction restraining the widow and children from dissipating any of the funds received from life insurance; and (9) for general relief.

From the decree it appears that the court (1) overruled the exceptions of defendants to the master's report and sustaining exceptions of plaintiffs to the master's report;

(2) Ordering that the defendant Mary E. Freeman surrender to the Equitable Life Assurance Society of the United States for cancellation within 25 days from the entry of the order, certificates of deposit numbers 21175 and 21176; that the defendant Walter W. Freeman, Jr., surrender to the Equitable Life Assurance

Company within 25 days from the entry of this order certificate number 21177 and that the defendant Marilyn Joan Freeman within 25 days from the date of entry of order surrender to said company certificate number 21178;

(3) That Equitable Life Assurance Company of the United States pay to Ernest E. Freeman within 25 days the money now in its hands held for Mary Freeman, being deposit number 21175 in amount of $3,347.86 plus interest at 3 per cent per annum from February 13, 1938 until paid; deposit 21176 in the amount of $5,895.25 plus interest at 3 per cent per annum from February 13, 1938 until paid; and the funds held by said company as deposits 21177 and 21178 payable to Walter W. Freeman, Jr. and Marilyn Joan Freeman, each in the amount of $5,895.25 plus interest at 3 per cent per annum from February 13, 1938 until paid;

(4) Ordering said Mary E. Freeman to pay to Ernest E. Freeman, plaintiff, the sum of $9,573.15 with the costs of this action which are taxed against said defendant Mary E. Freeman and plaintiff to have execution therefor;

(5) That after compliance by the defendants with the terms of the foregoing decree the plaintiff, Ernest E. Freeman, is ordered to pay to Lommen D. Eley as administrator *de bonis non cum testamento annexo*, coplaintiff, all sums that may hereafter be paid to him as a return of capital under the contract attached as exhibit A to the amended complaint filed herein.

The plaintiff, Ernest E. Freeman, was the brother of Walter W. Freeman, who was experienced in dealing in special assessment bonds. Walter W. Freeman invited plaintiff to participate in a proposed transaction to the extent of $30,000, which invitation he accepted, and gave Walter W. Freeman the $30,000. After the money had been delivered Walter W. Free-

man concluded not to undertake the transaction originally contemplated, but proposed a wholly different transaction which would involve other participants. To this new venture plaintiff demurred because it might last longer than he wished to risk his capital, whereupon Walter W. Freeman volunteered to secure the return of plaintiff's investment by insurance on Walter W. Freeman's life. Plaintiff acquiesced and a written agreement was drawn and executed on May 21, 1936. In that contract the name of Charles T. Rothermel appears, and for some reason, the agreement was rewritten to substitute the name of Louise J. Rothermel for the name of Charles T. Rothermel, and the agreement was re-executed on July 1, 1936.

In paragraph 2, Walter W. Freeman agreed to provide Ernest E. Freeman with life insurance on his life in insurance companies satisfactory to Ernest E. Freeman, "the policy or policies representing said insurance to be delivered to said Ernest E. Freeman, and to be so written or endorsed as to make the sums payable thereon" to Ernest E. Freeman or his representatives.

Paragraph 7 of the contract recites that the life insurance policies, "hereinafter mentioned" are listed on an exhibit attached, bearing the signatures of both parties. Exhibit "A" was obviously intended to list the insurance policies referred to in the agreement, but no policies were ever listed, and the defendants call attention to the fact that it will be observed that there is no specific reference in the contract either to existing policies or to new insurance, other than implied in the phrase last above quoted, and urge that the furnishing of $30,000 of new insurance in companies satisfactory to Ernest E. Freeman would have constituted full performance of the contract in this respect. It is further urged by the defendants that on the other hand, the indorsement of $30,000 of existing insurance

in companies satisfactory to Ernest E. Freeman would have been equally complete compliance with Walter W. Freeman's covenant. The phrase "so written or endorsed" gave Walter W. Freeman the unquestioned right to obtain new insurance or to indorse old insurance, and so long as written by a company acceptable to Ernest E. Freeman, no complaint could be made by the latter.

In discussing the questions involved in this litigation it is well to have in mind the facts, and it appears, as we have indicated, that Ernest E. Freeman was the brother of Walter W. Freeman; that in the early part of April, 1936, a syndicate was formed consisting of Walter W. Freeman, Ernest E. Freeman, Louise J. Rothermel, and A. T. Galt, to purchase special assessment bonds of the city of Chicago. Walter W. Freeman was to, and did, contribute $10,000, and was to manage the syndicate without compensation, other than his profits. The Rothermels contributed $35,000, and Ernest Freeman $30,000, and A. T. Galt was to, and did with Walter W. Freeman sign a note with the Continental Bank for certain moneys necessary for the syndicate. The syndicate purchased bonds of the face value of $573,840 for $286,211.24, using the contributions above mentioned of $75,000, and borrowed the balance, $211,211 from the Continental Bank, the note being signed as above mentioned, with the bonds as collateral security.

Of the bonds $123,845 were collected or sold, out of which sum $101,000 was paid on the loan with the Continental Bank, reducing the loan to $110,000.

The profits of the syndicate were to be divided as follows: Walter W. Freeman, 3/12ths; Ernest E. Freeman, 2/12ths; Louise J. Rothermel, 3/12ths; and Arthur T. Galt, 4/12ths. No net profits were to be divided until the entire amounts contributed by the syndicate members were paid, as well as the debt to the Continental Bank, and expenses of the syndicate.

A signed agreement was entered into between Walter W. Freeman and Ernest E. Freeman on May 21, 1936, and changed slightly, dated July 1, 1936, the changes having no reference to the issues involved, reciting that Walter was to have written or indorsed an insurance policy or policies on the life of Walter W. Freeman in the sum of $30,000 to protect Ernest E. Freeman on his capital investment. It is stated in both agreements that a list of the policies was attached thereto as exhibit "A," signed by the parties. No list of the policies, however, was ever attached to either agreement or signed. The syndicate was apparently a success, $101,000 was paid to the Continental Bank on the note, resulting from the sale of $123,845 face value of the bonds. It is probable that the bonds were sold practically at par, as there was undoubtedly expense money taken out of the sale. Ernest E. Freeman received $1,300 out of the sale of some coupons in cash, and $4,600, upon both of which he returned in his income tax return as profit, and paid income tax thereon. He says, however, that the $4,600 was not cash, but a "bookkeeping entry." It was, however, sufficiently tangible for Ernest E. Freeman to pay an income tax on, but not sufficiently tangible for him to deduct from the $30,000. It does not appear that the chancellor required him to deduct either sum, but did require that the widow and the children should pay him the full $30,000.

Walter W. Freeman at the time the syndicate was formed had contracts of life insurance totalling $85,000. He had policies for $15,000 and $20,000 with the Mutual Trust Life Insurance Company, two policies of $10,000 each with the Travelers' Insurance Company and two policies with the Equitable Life Assurance Society of the United States, one in the amount of $25,000 and one in the amount of $5,000. Against the latter two policies he had loans of many years' standing in the amounts of $6,727.30 and $1,363 re-

spectively. One of the policies of the Travelers' Insurance Company was signed to Belmont-Sheffield Liquidating Corporation. The other Travelers' policy was at all times payable to Mary E. Freeman, wife of Walter W. Freeman. Mary Freeman was likewise at all times beneficiary of the $20,000 Mutual Trust policy and of the $5,000 Equitable Life policy. The $15,000 Mutual Trust policy was originally payable to the estate of Walter Freeman, but he changed the beneficiary on November 27, 1937, to Mary E. Freeman, his wife, and on December 1, 1937, he changed the beneficiary of his $25,000 Equitable Life policy from his estate to Mary E. Freeman, his wife, Walter W. Freeman, Jr., and Marilyn Joan Freeman, his children, in equal shares.

The defendants contend that the writing between the plaintiff Ernest E. Freeman and Walter W. Freeman created no equitable lien on any of the policies, and call the court's attention to vol. 3, Pomeroy's Equity Jurisprudence, 4th ed., sec. 1235, which, it is contended, was adopted as the rule not only in Illinois, but in federal courts, and generally throughout the United States, and is as follows:

"THE GENERAL DOCTRINE—REQUISITES OF THE CONTRACT.—The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. Under like circumstances, a

merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done. In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation." and counsel agree that substantially the same rule has been declared by the United States Supreme Court in *Walker v. Brown*, 165 U. S. 654, and by the Illinois Supreme Court in *Aldrich v. R. J. Ederer Co.*, 302 Ill. 391, and quote 1 Jones on Liens, 3rd ed., sec. 33, where it is stated: .

"The instrument creating the lien is not effectual unless it plainly designates the property to be charged." However, the plaintiff criticizes this quotation by stating that in the text the plaintiff finds that the period in the foregoing sentence should be replaced with a comma and the sentence continued as follows: "though only such an identification is required as is essential to an enforcement of the lien."

The defendants further contend that *Hazenwinkle Grain Co. v. McComb*, 116 Ill. App. 541 is pertinent in the discussion of the questions involved, and it appears that the defendant advanced $105 on corn, which he agreed to sell and deliver at the market price. Jackson died before the corn was delivered. The administrator of Jackson's estate was notified of the agreement, and said administrator sold to the defendant all the corn belonging to Jackson's estate for the sum of $494.22. The defendant paid $389.22, leaving a balance due of $105, which the defendant claims it is

entitled to set off against the purchase price of the corn because it had an equitable lien for that amount on the corn belonging to Jackson. The court held that there was no equitable lien involved, and said:

"The rule is that it is indispensable to an equitable lien that the property intended to be charged therewith should be identified or described with a reasonable degree of certainty. *Union Trust Co. v. Trumbull,* 137 Ill. 146. It appears from the stipulation that at the time the contract between Jackson and appellant was entered into, no particular corn was separated or set apart or in any way identified, but that at that time the corn was still in the field. It does not even appear that the contract embraced all the corn then owned or possessed by Jackson, nor in fact any particular or specified quantity. It is therefore apparent that appellant had neither legal nor equitable title to nor actual or constructive possession of the corn, nor a right to the proceeds thereof, nor had it either a legal, equitable or statutory lien thereon. At most it had but a right of action for the money advanced by it and for damages, if any, arising from a breach of the contract."

In *Aldrich v. R. J. Ederer Co.,* 302 Ill. 391, upon which the defendants rely, the court said:

"It has been held that whenever parties enter into an express executory agreement in writing indicating an intention to make some particular property, real or personal, or a fund, security for a debt or other obligation, there is created an equitable lien on the property described in such contract which is enforcible in the hands of the original contractor, and also his heirs, administrators, executors, voluntary assignees, purchasers and incumbrancers with notice. (*Walker v. Brown,* 165 U. S. 654; 10 R. C. L. sec. 100.) An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. It is not a

*jus in re* or a *jus ad rem;* neither a debt nor a right of property, but a remedy for a debt. (*Webster v. Nichols,* 104 Ill. 160.) 'It is simply a right of a special nature over the thing which constitutes a charge or incumbrance upon the thing, so that the very thing itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree, and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists.' (3 Pomeroy's Eq. Jur. —4th ed.—sec. 1233.) The application of the doctrine of equitable lien has been recognized in this State. *Webster v. Nichols, supra.''*

In *Kukuk v. Martin,* 331 Ill. 602, the Supreme Court, in commenting upon the question as to whether certain hogs were subject to a lien, said:

''It is contended by plaintiffs in error, among other things, that defendant in error did not acquire an equitable lien on the 108 hogs by the transaction with Kelley; that the court erred in admitting the testimony with reference to the conversation between defendant in error and Gilmore and between Leonard and Kelley. The consideration of these questions is not necessary to a determination of this cause. An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. It is not a *jus in re* or a *jus ad rem.* It is neither a debt nor a right of property but a remedy for a debt. It is simply a right of a special nature over the property which constitutes a charge or encumbrance thereon, so that the very property itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists. (*Aldrich v. R. J. Ederer Co.,* 302 Ill. 391.) The remedies of equity are, as a class, specific. The doctrine of 'equita-

ble liens' was introduced for the sole purpose of furnishing a ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. In a large class of executory contracts, express and implied, which the law regards as creating no property right or interest analogous to property but only a mere personal right and obligation, equity recognizes, in addition to the personal obligation, a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing and to enforce the defendant's obligation by a remedy which operates directly upon that thing. Pomeroy's Eq. Jur. (4th ed.) p. 2961.''

The plaintiffs are quite content with the authority cited by the defendants in point 1 of this brief, Pomeroy's Equity Jurisprudence, as a general statement of the doctrine of equitable liens, and as stated by counsel for the defendants, substantially the same rule has been declared by the United States Supreme Court in *Walker v. Brown,* 165 U. S. 654, and by the Illinois Supreme Court in *Aldrich v. R. J. Ederer Co.,* 302 Ill. 391, and call attention to the fact that the defendants have quoted Jones on Liens, 3rd ed. sec. 33, as stating: ''The instrument creating the lien is not effectual unless it plainly designates the property to be charged,'' and the plaintiffs suggest that in the text as we find it, the period in the foregoing sentence should be replaced with a comma and the sentence continued as follows: ''though only such an identification is required as is essential to an enforcement of the lien,'' and they cite among the texts as the best discussion of this subject Hanbury's ''Modern Equity'' a leading English authority, in which the author said, p. 31: ''Equity will not render any help unless the

person who invokes it can specifically earmark the fund which he claims, and can show that he has the equitable equivalent of a proprietary interest in it. We have arrived at the root distinction between the *restitution* which is the keynote of equitable relief on behalf of a *cestui que trust* against a trustee, and the *repayment* which is the keynote of common law relief on behalf of a debtor against a creditor. That equity is uncompromising in its requirement of a specific fund is well illustrated by another famous decision of the House of Lords, *Hoare v. Dresser,* which laid down the following proposition: if there has been an engagement to appropriate to a certain individual a particular cargo, or a particular part of a larger cargo, as *e. g.,* 'one hundred quarters of wheat out of five hundred quarters which I have now sent,' in either of these cases equity will interfere to compel performance; *but it is quite useless for the promisee simply to show that the promisor has in his possession such a quantity of wheat;* something much more definite is needed. It is easy enough to point out the difference between 'six bottles of champagne' and 'six bottles out of that particular dozen'; equity will render no aid in a contract with the former subject-matter, but will treat the latter as its own particular province.''

The defendants call attention to and quote the language of Lord Cronworth in the *Hoare* case (VII House of Lords cases, 291) as follows:

''But I apprehend that neither in equity nor in law can there be any jurisdiction to say that because there is property of the person who ought to have fulfilled his contract, therefore you can make that property available for the specific performance of the engagement.'' and contend that the court here is without jurisdiction to do what the plaintiffs by their amended bill seek to have the court do, and in addition to the authorities that we have quoted, plaintiffs point to

*Klaustermeyer v. Cleveland Trust Co.,* 89 Ohio St. 142, as an authority supporting the position of the plaintiffs in this litigation, and quote as follows:

"The finding of fact by the common pleas court, and which was adopted by the circuit court, uses this language:

" 'Those directors not indebted to the trust company and making deposits therewith, in accordance with said agreement, should be given security for such deposit, from among the collateral securities then owned by and in the possession of said trust company.'

"Clearly, this identifies the fund or property which was to furnish the security and which was to be charged with a lien for the benefit of securing Klaustermeyer's loan. But it is said that this clearly indicates that there was to be only some part, some portion or fraction, of said securities separated from the residue before the lien would attach." And among several citations, the plaintiffs cite the case of *Lewis v. Braun,* 356 Ill. 467, and quote the language of the court as follows: "Without considering his other remedies, it is sufficient to say that complainant was given certain equitable rights under the contract, and that these rights were not extinguished by the death of Braun but are in danger of being lost by the unjust course of Mrs. Braun unless a court of equity intervenes. . . . The matter of fees to be paid to complainant was not left to subsequent arrangement between the parties for reasonable compensation but was definitely fixed by written contract at certain percentages of the total sum collected. This was sufficient to constitute an equitable assignment." and the plaintiffs argue that the principles laid down in the above case also govern the present case, and state that there the court held that it was sufficient to constitute an equitable assignment if the parties intended to appropriate to the assignee a certain percentage of some indefinite fund, the exact

amount of which was to be determined at some future time.

The defendants, however, quote the following language found in the opinion of the court:

"It is urged by appellees that there can be no lien before there is a recovery as there is no *res* or subject matter upon which an equitable lien may attach. This statement does not accord with the facts in this case, as the allegations of the bill show there is a definite *res* involved in this proceeding, consisting of forty-eight stock certificates, with serial numbers and full description given." Clearly, it is suggested by the defendants, the *res* was definitely identified in the senator's case within the meaning of Mr. Pomeroy's definition.

It is argued by the defendants that nowhere does the contract provide any personal obligation on the part of Walter W. Freeman to repay any part of Ernest E. Freeman's contribution, except from the operations of the independent entity of joint venture. True, Walter W. Freeman covenanted to secure Ernest E. Freeman against loss, but there was no debt due or owing from Walter W. Freeman to Ernest E. Freeman at any time, nor did Walter W. Freeman assume any obligation toward Ernest E. Freeman other than to furnish him with security. This was an independent covenant, wholly distinct and separate from any relationship of debtor and creditor, which is one of the essential requisites of an equitable lien, and the defendants further suggest that no allegation will be found in the amended complaint and no proof will be found in the record that the joint venture even threatens to be unsuccessful or fail to return to Ernest E. Freeman his entire contribution thereto. It is elemental that where one is required to respond for the obligation of another, he automatically steps into the shoes of the creditor whose

obligation is paid, with all of the rights and privileges of the creditor.

The real question, however, when we come to consider the authorities is to ascertain the intention of the parties to the agreement in question, and in doing so the court is to consider the language employed in the instrument and the facts and circumstances that are present in the record.

The question to be considered is whether the testimony of Ernest E. Freeman and George Fink was properly admitted upon the issues as they are presented to this court. The plaintiffs contend that the evidence to which exceptions have been taken consisted of the testimony of the plaintiff Ernest E. Freeman and the late Walter W. Freeman's attorney, George Fink, explaining the provision in plaintiffs' exhibit 4 by which Walter W. Freeman promised ''to provide said Ernest E. Freeman with life insurance on the life of said Walter W. Freeman in life insurance companies satisfactory to said Ernest E. Freeman in the sum of $30,000. . . .'' The plaintiffs contend that both Ernest E. Freeman and Walter W. Freeman intended by the quoted language a promise by Walter W. Freeman to provide Ernest E. Freeman with insurance out of the policies then in force on Walter W. Freeman's life, and point to the testimony of Ernest E. Freeman and George Fink, Walter W. Freeman's lawyer, who drew the agreements, and by Fink's contemporaneous conference notes, that the very question here in issue had been expressly raised when the contract terms were being settled and the draftsman instructed, and that Walter W. Freeman had flatly agreed to furnish Ernest E. Freeman $30,000 out of the insurance then in force. The defendants object to this testimony under the parol evidence rule as hearsay.

Upon the question of the admissibility of parol evidence in a matter such as is before this court, the plaintiffs call attention to the case of *Chicago Auditorium Ass'n v. Corporation of Fine Arts Bldg.*, 244 Ill. 532, in support of their contention that the evidence of the conversations had between the parties and the attorney, George Fink, was competent. The court upon this subject said: "The same rules of law are applicable to the construction of leases that are applicable to the construction of other contracts, and where the language of a lease is the subject of construction, the object to be attained is to ascertain, if it can be done, the intention of the parties to the instrument and give effect to that intention. . . . It was said in *Street v. Chicago Wharfing Co.*, 157 Ill. 605, at page 614: 'The court will, if necessary, put itself in the place of the parties and read the contract in the light of the circumstances surrounding them at the time it was made and of the objects which they then evidently had in view. So, also, the acts of the parties themselves, indicative of their construction placed upon it, may be resorted to for the purpose of determining the true meaning of the written agreement. And in this regard it makes no difference whether such acts are contemporaneous or subsequent.' Preliminary negotiations may be considered for the purpose of determining the meaning and intention of the parties in the use of the words employed in the instrument, but not for the purpose of varying or contradicting the plain terms of the instrument." The defendants, however, contend that counsel failed to include in the quotation one sentence which is replaced by asterisks in the brief. That omitted language is as follows:

"If the language is plain and unambiguous, proof *aliunde* cannot be heard to contradict or vary its meaning, or give it a meaning inconsistent with the language used in the instrument." and direct also to the lan-

guage of the court in this same opinion, where it is said: "Preliminary negotiations may be considered for the purpose of determining the meaning and intention of the parties in the use of the words employed in the instrument, but not for the purpose of varying or contradicting the plain terms of the instrument."

When we come to consider the evidence such as was introduced over objection, we find the facts are that an understanding between the plaintiff and Walter W. Freeman is said to have been reached on April 16, 1936. Thereafter, in the latter part of that month they visited the attorney and gave him directions as to what should be contained in the written agreement. The attorney testified that he prepared three or four drafts of the contract and finally one proved to be acceptable to Ernest E. Freeman and Walter W. Freeman and that the acceptable draft was executed on May 21, 1936. The contract having been drawn after joint direction, revised more than once, and submitted for examination and approval, ultimately resulting in execution, demonstrates conclusively that the language of the contract clearly expressed the understanding of the parties, and the defendants suggest further that the contract of May 21, 1936, was never completed by the listing of the insurance policies as contemplated. Forty days later, and on July 1, 1936, another contract was executed which employed the identical phrase attacked by the plaintiffs. If, as contended by Ernest E. Freeman the matter of insurance was so definitely understood before the original contract was drawn, and if, as contended by him, the designation of the policies then in force was of such vital importance to him, it would seem strange that he did not object to the phraseology of the contract or require such designation to be made before affixing his signature to the contract on July 1, 1936. That is a reasonable suggestion. The court in considering this question has in mind the facts

as they were related to Mr. George Fink, the attorney for the parties, and that he prepared several of the drafts, and the draft that was finally approved and executed was that dated July 1, 1936, and if, as contended by the plaintiffs, the insurance policies that were to be the subject of the lien were the policies which were then in existence at the time of the execution of the contract, it does not seem reasonable that Ernest E. Freeman, having all these facts in mind, should have executed the contract in the form it now is, and we rather agree with the theory of the defendants that the plaintiff not having made any objection, it is but proper to consider that the intention of the parties at the time this contract in question was executed clearly expressed the understanding of the parties at the time they signed the contract on July 1, 1936.

The plaintiffs commenting on defendants' argument state it is reasonable to suppose that Walter W. Freeman would have taken out additional policies of life insurance had Ernest E. Freeman insisted upon compliance with the agreement sued upon. In answer the defendants state that Walter W. Freeman after the execution of the contract had applied for insurance and had been rejected, so that being called to our attention, it is only an item of evidence tending to show the intention of Walter W. Freeman in regard to furnishing further insurance.

After consideration of the questions involved, the contract which was executed by the plaintiff and the defendant creates no equitable lien on any of the policies for the reason that it is essential that the property be identified whereby the party promised to convey, assign or transfer the property as provided for in the contract, and there being that uncertainty about it, it is our opinion that the court erred in entering the decree in question, and it is reversed, and the cause is remanded.

While other questions have been called to our attention, it will not be necessary to consider them for the reasons we have stated in the opinion and the conclusion we have reached in the matter before us.

The plaintiffs in this action presented a motion to this court to strike the defendants' reply brief that had been filed in this appeal, and the principal ground upon which the motion is based is that for the first time it appears in the reply brief of the defendants that the court ignored the defendants' right of subrogation.

If they be required to surrender, in insurance certificates and cash to Ernest E. Freeman the sum of $30,000, then in justice and equity they should be recognized as being subrogated *pro tanto* to Ernest E. Freeman's position and rights in the joint venture, and the point is made that this answer of the defendants was not raised at any time until the filing of the reply brief. The answer, in short, of the defendants is that the court granted relief to the plaintiff Lommen D. Eley, administrator *de bonis non* not prayed for or urged by this plaintiff, and such being the fact they contend, of course, that they had the right to raise the question that is now objected to by the plaintiffs. However, upon a hearing, the motion was taken by this court to be passed upon, and from the conclusion we have reached, the question is not material, and for that reason the motion to strike will be denied.

*Reversed and remanded.*

DENIS E. SULLIVAN, P. J., and BURKE, J., concur.