375 P.2d 576

RESERVE PLAN, INC., a corporation, Plaintiff-Appellant and Cross-Appellee,

v.

Marjorie Q. PETERS and Jack McElhose, Defendants-Appellees,

First National Bank in Albuquerque, Defendant-Appellee and Cross-Appellant.

No. 6931.

Supreme Court of New Mexico.

Oct. 3, 1962.

Rehearing Denied Nov. 7, 1962.

Hannett, Hannett & Cornish, Albuquerque, for appellant and cross-appellee.

James Sidwell, Albuquerque, for Jack McElhose.

Rodey, Dickason, Sloan, Akin & Robb, Ray H. Rodey, Albuquerque, for appellee and cross-appellant.

MOISE, Justice.

Reserve Plan, Inc., hereinafter referred to as Reserve, brought this action to have the court declare its rights in and to a contract of sale of a dance studio in Albuquerque made by defendant Marjorie Q. Peters, hereinafter referred to as "Peters," and her former husband, with some people by the name of Heck, and dated August 9, 1956. Jack E. McElhose, hereinafter referred to as "McElhose" and the First National Bank in Albuquerque, hereinafter referred to as "Bank" were also named defendants. Both filed answers and, in addition, McElhose counter-claimed against Reserve, and cross-claimed against the Bank, which filed its answer denying liability and tendered into court all moneys collected on the transaction remaining in its hands.

Reserve's claim arose by virtue of a loan of $7,000.00 made to Peters on November 7, 1956. A note in this amount bearing that date was executed by Peters to Reserve. The note bore interest at 6% per annum, and according to its terms was due on or before January 1, 1960.

At the time the note was executed, Peters also executed an assignment of all her right, title and interest in the August 9, 1956 contract. Reserve, in its brief in chief, concedes that the assignment was not effective until there was a default in payment of the note, and that it had no claim against the moneys paid on the contract before then.

It is uncontroverted that Peters and her former husband sold the dance studio pursuant to the August 9, 1956 contract, and that thereafter, upon their being divorced, it was agreed that one-half of the proceeds from the contract belonged to Peters and the other half to her former husband.

Peters borrowed the $7,000.00 represented by the note to Reserve in order to start a dance studio in Long Beach, California. She took the note in to the Bank and the Bank endorsed an acknowledgment on it to the effect that the August 9, 1956 contract for sale of the dance studio was escrowed with the Bank and that the November 2, 1956 unpaid balance on the contract was $63,994.53. There is a dispute in the evidence as to whether the Bank saw or knew of the assignment to Reserve. Peters testified that when she took the note in, and the endorsement was made on it, she also showed the Bank the assignment. Although no one testified that this was not true, no copy of the assignment was in the Bank files until October 10, 1958, and the court found that on April 17, 1957 neither the Bank nor Paul Curry, who was assignee of the Heck's interest as purchasers in the August 9, 1956 contract, had actual or implied notice of the assignment to Reserve dated November 7, 1956.

It was on April 17, 1957, that Peters addressed a letter to the Bank, countersigned by the defendant McElhose, which instructed the bank to deposit her share of

the proceeds from the 1956 contract of sale in a checking account in the name of Marjory Q. Peters and Jack McElhose. The letter specifically stated that McElhose made no claim of ownership of the money and gave as the purpose for its creation, certain "business dealings" in California between Peters and McElhose. No change was to be made in the handling of the account without the concurrence of both Peters and McElhose.

After receipt of the letter by the Bank, it handled all moneys of Peters received under the contract of August 9, 1956, as directed in the letter until about December, 1958, at which time the joint checking account was closed by the Bank at the direction of Peters without any authority or concurrence from McElhose.

The court found that on April 16, 1957, McElhose and Peters and others had entered into a business venture, in connection with which McElhose advanced Peters $5,000.00. On that date a document in the nature of a partnership agreement was executed by Peters and McElhose and the other parties to the venture. The court found that it was the intent of Peters to secure McElhose in the moneys advanced, and to be advanced.

Although Peters testified that when McElhose advanced the first money to her, she told him of the assignment to Reserve, McElhose categorically denied this, and the court found that McElhose had no knowledge, actual or implied, of any assignment until December, 1958. (The finding uses the date 1959. However, this is patently a typographical error).

The court concluded that an equitable lien was created by the April 17, 1957 letter in favor of McElhose to secure advances, the unpaid balance of which at the time of trial amounted to $12,000.00, and that the Bank acted wrongfully in closing the joint account and disbursing any moneys to Reserve, and should restore to the joint account any amounts so disbursed. From a judgment to this effect, Reserve and the Bank appeal.

Both Reserve and the Bank tendered certain findings of fact to the court relating to the dealings between Peters and Reserve, all of which findings were refused. Complaint is made of this refusal. An examination of the findings made by the court discloses that no notice was taken therein of the claimed indebtedness and assignment to Reserve. The court limited itself to findings as to the McElhose claim, lack of notice of any other claim, and conclusions that McElhose had a valid equitable lien against Peters' share of the proceeds from the August 9, 1956 contract, and payment by the Bank of any amounts except to satisfy the lien was wrongful so that the Bank must account for any moneys so wrongfully disbursed.

If the court was correct that an equitable lien was created by the April 17, 1957 letter, and that such lien would be superior and paramount to any prior claim of which neither McElhose, the Bank, nor Curry had any notice then, in our view, failure of the court to make any findings concerning the Reserve claim would be harmless and not prejudicial to Reserve or the Bank. Accordingly, we consider those questions first.

In Kahnt v. Jones McKeen Mercantile Co., 32 N.M. 537, 260 P. 673, this court had occasion to consider a claimed equitable lien. In that case Kahnt had purchased a herd of cattle and turned them over to one Fred Lant to run. It was agreed that Lant should have no salary but should get his expenses and family support exclusively out of the steer money, and should participate in the profits. Kahnt sought an accounting and an injunction against paying any of the proceeds from the sale of steers to Lant, claiming that Lant had wrongfully sold steers and other cattle and applied the proceeds to his own use; that he had not paid the expenses as agreed; and that he had contracted to sell some steers on which a down payment had been made which was being held in the American National Bank of Silver City. The Mercantile Company and one Louis Jones intervened claiming equitable liens against the proceeds of the sale of the steers, their claim being based on allegations that they had furnished ranch and family supplies to Lant in reliance upon the contract between Kahnt and Lant, and on the promise of Lant and Kahnt that they would be paid out of the proceeds from the sale of the steers.

A judgment in favor of the intervenors was reversed on appeal, the court holding that the facts did not establish an equitable lien on the proceeds of the sale of the steers. The court assumed that under his contract Lant would have been entitled to a lien against the steer money for the purposes specified if he had performed, and then had the following to say:

"So there is nothing to support this judgment, except the alleged facts that appellant promised to pay for the supplies before they were furnished, and that he named a particular source of a future fund from which payment should be made. The equitable consideration is that the supplies furnished were beneficial to appellant, and contributed more or less to the creation of the fund. It is doubtful under the findings and evidence whether any such promise was made. But, considering that it was made, the facts are not sufficient. *A mere promise to pay out of a particular fund does not amount to an equitable assignment or create an equitable lien. There must be also an appropriation of the fund, placing it beyond the control of the promisor, and conferring a complete and present right in the promissee, and such that the holder may not only*

*safely pay, but may be compelled to pay, though forbidden by the promisor.* Smedley v. Speckman ([85] C.C.A. [179]) 157 F. 815. This is the rule even in cases where 'the fund was created through efforts and outlays of the party claiming the lien.' See the following texts and the authorities they cite: 37 C.J. 'Liens', § 21; 3 Pomeroy's Equity Jurisprudence (4th Ed.) §§ 1280, 1282; Jones on Liens, §§ 48–52. Upon these principles and authorities, invoked by appellant, we find nothing to cast doubt. From them it seems clear that the court erred in establishing liens in favor of the interveners." (Emphasis supplied).

This case was followed by Snipes v. Dexter Gin Co., 45 N.M. 475, 116 P.2d 1019, wherein plaintiff sought to recover the value of a government subsidy check and 16 bales of cotton from the defendant. Plaintiff sold Gentry a piece of land for $3,000 cash, assumption of a $3,500 note secured by a mortgage on the real estate, with the balance of the purchase price, represented by 15 notes, to be paid $1,500 per year for 15 years from the proceeds of the land. Gentry took possession of the property, and in order to secure a $3,000 loan, gave defendant an assignment of the government subsidy and a chattel mortgage on the crops to be grown on the land in 1939. Plaintiff claimed she was entitled to the subsidy payment and the 16 bales of cotton grown in the year 1939. The court cited and quoted with approval from Kahnt v. Jones McKee Mercantile Co., supra, but held that plaintiff had retained no lien on the crops to be grown by Gentry, and as purchaser under the contract Gentry was equitable owner of the property and the growing crops; and accordingly, the chattel mortgagee had the superior right.

From the foregoing it is clear that in order to create a valid lien in equity there must be something more than a mere promise to use particular funds in satisfaction of a debt. The particular funds must be appropriated by the debtor to the satisfaction of the debt. To accomplish this the promisor must have placed the fund beyond his control, and must have granted to the promissee a complete and present right therein so that the holder of the funds could not only safely pay, but could be compelled to pay although the promisor had changed his mind. Re Estate of Purman's, 358 Pa. 187, 56 A.2d 86, 175 A.L.R. 1129. See also B. Kuppenheimer & Company v. Mormin, 8 Cir., 78 F.2d 261, 101 A.L.R. 75, together with cases cited in the note commencing on page 81; 32 A.L.R. 956.

Another test is whether the agreement clearly discloses an intention to create a lien. Waldroup v. State, 198 Ga. 144, 30 S.E.2d 896, 153 A.L.R. 914. In Watson v. Hobson, 401 Ill. 191, 81 N.E.2d 885, 890, 7 A.L.R.2d 1156, it is stated that:

"An equitable lien is the right to have property subjected, in a court of equity, to the payment of a claim. It is neither a debt nor a right of property but a remedy for a debt. It is simply a right of a special nature over the property which constitutes a charge or encumbrance thereon, so that the very property itself may be proceeded against in an equitable action and either sold or sequestered under a judicial decree, and its proceeds in one case, or its rents and profits in the other, applied upon the demand of the creditor in whose favor the lien exists. Aldrich v. R. J. Ederer Co., 302 Ill. 391, 134 N.E. 726; Kukuk v. Martin, 331 Ill. 602, 163 N.E. 391. Equity recognizes, in addition to the personal obligation, in some cases, a peculiar right over the thing concerning which a contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, by means of which the plaintiff is enabled to follow the identical thing and to enforce the defendant's obligation by a remedy which operates directly upon that thing."

Our problem, then, is to apply the rules as above announced. The proceeds collected and to be collected under the contract of August 9, 1956 were a particular fund which Peters as payee of one-half could appropriate to the payment of her obligations. Did she by her actions clearly disclose an intention to create a lien against these funds and to place them beyond her control? Did she give McElhose an immediate right to the proceeds so that the Bank could safely pay him, or on failure be compelled to do so?

The important language is the following, contained in the April 17, 1957 letter to the Bank:

"It is now my request * * * that as to the portion of said collection allocable to myself you handle them in the following manner.

"Deposit all proceeds as received in a checking account 'Marjory Q. Peters and Jack McElhose * * *.'

"The reason for this handling is that I am placing these such proceeds in a collateral account, in connection with business dealings in California between myself and Mr. McElhose. Such deposit does not change the ownership of the funds in any way, and Mr. McElhose makes no claim on this money as owner. No change shall be made in the proposed handling by you of my portion of the cash collected, and I shall remain without power to direct any change, until you have been advised in writing by both parties or their legal representatives."

■ Our analysis of the language used leads us to conclude that no lien in equity

was created by the instrument. The instruction to the bank is to set up an account in the name of Peters and McElhose to be used in connection with a "collateral account" pertinent to business dealings of the parties in California. The direction is not to hold any of the funds for McElhose, but on the contrary to put them into an account in his name and that of Peters. He could not draw the funds, or demand them without the concurrence of Peters. It makes no difference that she also put it out of her power to demand the funds or change the directions to the Bank without the agreement of McElhose. Thus it is seen that the intention to create a lien in favor of McElhose is not clear and satisfactory. Neither was McElhose given an immediate, or clear and present right to the funds when collected so that the Bank could safely pay them over to him or be compelled to do so. It follows that no equitable lien in favor of McElhose was created and that the court erred in so concluding.

Having determined that McElhose had no equitable lien, it nevertheless does not necessarily follow that Reserve was entitled to the relief which it sought. Upon remand, it will be incumbent upon the court to determine the ownership of the proceeds received by the Bank prior to January 1, 1960, and that received thereafter. Since it does not appear that the trial court has passed upon this issue but limited its consideration to the question of the validity of the claimed equitable lien of McElhose, we express no opinion on the problem.

The judgment is reversed and the cause remanded with instructions to proceed in a manner consistent herewith.

IT IS SO ORDERED. .

COMPTON, C. J., and CHAVEZ, J., concur.

CARMODY and NOBLE, JJ., not participating.