# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| 12TH AND JOHN INVESTORS, LLC, a Washington limited liability company,<br><br>Appellant,<br><br>v.<br><br>BROADMARK REALTY CAPITAL INC., a Maryland corporation; and CAPITOL HILL SUBWAY, LLC, a Washington limited liability company,<br><br>Respondents. | DIVISION ONE<br><br>No. 84748-1-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — 12th and John Investors, LLC, appeals from the order of the superior court denying its motion for partial summary judgment and granting Broadmark Realty Capital Inc.'s motion for summary judgment. 12th and John Investors asserts that the trial court erred because equity requires that we permit 12th and John Investors to enforce alleged terms of its agreement with a real estate developer (an agreement allegedly involving investing and sharing ownership in that developer's company and preferring repayment of the investor's return on its investment over repayment of certain of that company's loan debts) against Broadmark Realty Capital, a nonparty to that agreement and a lender creditor to that development company. 12th and John Investors also asserts that the only possible interpretation of certain terms within the agreement in question is that it and the developer decided amongst themselves that, in the

event that the developer defaulted on certain of his obligations to the investor, an equitable lien would be created against certain loan proceeds stemming from Broadmark Realty Capital's predecessor-in-interest's loan agreements with the development company. Because equity does not require that we find in 12th and John Investors' favor and because 12th and John Investors' proposed interpretation of the writings memorializing the agreement in question is neither commercially reasonable nor, for that matter, plausible, 12th and John Investors' assertions fail.[1] Accordingly, we affirm.

I

A

In 2015, real estate developer Robert Hardy sought to develop a 51-unit rental apartment complex on three acres of land in the Capitol Hill neighborhood of Seattle. In early 2016, Hardy incorporated an entity to hold title to that land, listed himself as that entity's only member, and named it Capitol Hill Subway, LLC.[2] The sole purpose of Capitol Hill Subway was to develop the land in question.

During the initial stages of the development project, Hardy sought a construction loan from one of Broadmark Realty Capital's predecessors-in-interest, which declined to loan the money. Hardy then sought a construction loan from another entity, Trez Capital, LP, which agreed to loan $10.9 million to

---

[1] 12th and John Investors also asserts that the trial court erred in its consideration of the investment company's various tort claims against Broadmark Realty Capital's predecessor-in-interest. As discussed in Section III, these assertions fail as well.

[2] Hardy created Capitol Hill Subway through Hardy Development Company, LLC, a company in which he is the only member. For the purposes of this opinion, we treat Hardy and his development company as one.

Capitol Hill Subway in exchange for a first position deed of trust in the Capitol Hill property. Hardy also obtained a loan from another entity, Sherwood Credit I, LLC, which issued a $1.5 million loan in exchange for a second position deed of trust in that property.

Also around this time, Hardy sought equity investors in Capitol Hill Subway. He obtained such an investment from 12th and John Investors, which was formed by a group of individual investors for the purpose of making "a preferred equity investment in Capitol Hill Subway, LLC."[3]

In February 2016, Hardy and 12th and John Investors memorialized their agreement in two writings. The writings indicated that their agreement involved investment in and ownership of Capitol Hill Subway and that the parties to that agreement were 12th and John Investors, Hardy, and Capitol Hill Subway.[4] The writings specified that Hardy would be the manager of Capitol Hill Subway. The writings provided that, in exchange for a $3.2 million investment, 12th and John Investors would receive that value in preferred membership interests in Capitol Hill Subway and would receive a return on that investment with interest accruing at a rate of 30 percent compounded annually.

The writings specified that Capitol Hill Subway—i.e., Hardy—was required to obtain 12th and John Investors' written consent before performing numerous actions—including prior to agreeing to a loan refinance on the development property in question. The writings further specified that Capitol Hill Subway

---

[3] 12th and John Investors' limited liability company agreement provided that its members were aware that the investment in question was a "High Risk Investment."

[4] Broadmark Realty Capital's predecessor-in-interest was not identified as a signatory to the writings between 12th and John Investors and Hardy.

would distribute to 12th and John Investors a return on its investment from cash generated by the operations or sale of the property in question. The writings provided several prices at which Capitol Hill Subway could buy back 12th and John Investors' interest in the company and also appeared to condition many of Capitol Hill Subway's obligations to 12th and John Investors on whether Capitol Hill Subway had previously done so.

The writings provided that Capitol Hill Subway was obligated to buy back 12th and John Investors' interest by the end of August 2018.

The writings contained dedicated default and remedy sections, identifying conduct constituting a default by Hardy on Capitol Hill Subway's obligations to 12th and John Investors and numerous of 12th and John Investors' remedies in the event of such a default. The writings also contained a personal guarantee by Hardy of not only 12th and John Investors' multimillion-dollar investment in Capitol Hill Subway, but also the investor owner's 30 percent rate of return on that investment.

Thereafter, the two owners of Capitol Hill Subway were its original owner, Hardy, and its preferred investor owner, 12th and John Investors.

B

One and a half years later, in late 2017, construction on the development project had not yet been completed, with the project falling behind schedule and running over budget. In early 2018, Hardy—on behalf of Capitol Hill Subway—requested a $1.2 million loan from Trez Capital, in exchange for further encumbrance of the development property, which Trez Capitol agreed to provide.

4

Hardy received written consent from 12th and John Investors to undertake this loan refinancing.

Several months later, the development project had again fallen behind schedule and was running over budget. Trez Capital indicated to Hardy that it was ceasing its disbursement of loan proceeds to Capitol Hill Subway, which would leave the company without adequate proceeds to complete construction on the project. Hardy therefore sought another entity to take over Trez Capital's loan. He again approached Broadmark Realty Capital's predecessor-in-interest in question and, on this occasion, that lender agreed to loan money to Capitol Hill Subway.

Thereafter, in April 2018, Broadmark Realty Capital's predecessor-in-interest signed an agreement with Capitol Hill Subway to loan $14.3 million to Capitol Hill Subway, secured by a first position deed of trust on the development property.[5] Hardy purportedly did not obtain written consent from 12th and John Investors to sign that loan agreement on Capitol Hill Subway's behalf with Broadmark Realty Capital's predecessor-in-interest.[6] None of the individual members of 12th and John Investors objected to such omission, notified Hardy that Capitol Hill Subway was in default of its obligations under the co-owners' writings, nor otherwise sought relief in response to that loan refinance agreement. Thereafter, Broadmark Realty Capital's predecessor-in-interest

---

[5] Broadmark Realty Capital's predecessor-in-interest's loan paid off the Trez Capital loan and paid down a portion of the Sherwood Credit I loan.

[6] For the purpose of our decision, we assume, without deciding, that Hardy did not obtain written consent from 12th and John Investors to refinance Capitol Hill Subway's loan against the development property with Broadmark Realty Capital's predecessor-in-interest during the time in question.

disbursed the loan proceeds in accordance with the terms of its loan agreement with Capitol Hill Subway and construction on the project continued.[7]

In mid-2018, Capitol Hill Subway—through Hardy—decided to convert the residential unit development project from apartment units to condominium units, with the expectation that the condominium sales would result in a greater financial return on the project.[8]  Meanwhile, Capitol Hill Subway sought and obtained another loan refinance with Broadmark Realty Capital's predecessor-in-interest, further encumbering the development property in exchange for a $3 million loan.  Capitol Hill Subway again did not obtain written consent from 12th and John Investors for this loan refinance, and no individual member of 12th and John Investors objected, invoked the co-owners' writings, nor otherwise sought relief in light of the transaction.  Broadmark Realty Capital's predecessor-in-interest again disbursed the loans consistent with its loan agreements with Capitol Hill Subway.[9]  Construction on the project proceeded.

In late August 2018, the date arrived on which Capitol Hill Subway was obligated to buy back 12th and John Investors' interest in Capitol Hill Subway. Capitol Hill Subway did not do so.  Neither the manager of 12th and John Investors nor any of its individual members declared Capitol Hill Subway to be in

---

[7] None of the April 2018 loan proceeds were disbursed to 12th and John Investors.  None of 12th and John Investors' members objected to the loan disbursements, declared that Capitol Hill Subway was in default, nor otherwise sought relief against Broadmark Realty Capital's predecessor-in-interest in response to these disbursements.

[8] The members of 12th and John Investors were apprised of the decision to covert the development project from an apartment building to a condominium building and did not object.

[9] No portion of those loan proceeds was disbursed to 12th and John Investors.  None of its members objected.

default under their agreement nor did they seek any remedies provided in the companies' agreement. Meanwhile, construction on the project continued.

In November 2018, Capitol Hill Subway's development project was nearing completion, and Hardy designated a real estate agent to assist with sales and marketing of the development project's condominium units.

In December 2018, 12th and John Investors sent a letter to Hardy declaring that Capitol Hill Subway "is in default as a result of the failure to make payment to [12th and John Investors] of the Preferred Return and repayment of the investment of [12th and John Investors] in [Capitol Hill Subway], by August 31, 2018." The letter further identified that such a default triggered its ability to seek remedies under the co-owners' writings, indicating that 12th and John Investors

> can force a sale of the Property. [12th and John Investors] also has the right to take possession of the Property, appoint a manager, and take over completion of the Project. [12th and John Investors] can also have a receiver appointed and may exercise all other rights and remedies provided for at law or in equity.

After mailing the letter to Hardy, however, neither 12th and John Investors' manager nor any of its members elected to pursue any such remedies against Capitol Hill Subway or against any other party. Meanwhile, the real estate agent continued marketing and attempting to sell the condominium units.

Between January and July 2019, the real estate agent sought and obtained, on Capitol Hill Subway's behalf, several extensions on the maturity date of Broadmark Realty Capital's predecessor-in-interest's loan to Capitol Hill Subway, each of which increased the total encumbrance on the development

7

property in question. No written consent by 12th and John Investors appears to have been obtained for such refinancing, and 12th and John Investors, again, did not notify Hardy of any alleged default on their agreement.

Around this time, the condominium units began to sell. Capitol Hill Subway, pursuant to its loan agreement with Broadmark Realty Capital's predecessor-in-interest, applied the proceeds of such sales to the principal and the interest accruing on Broadmark Realty Capital's predecessor-in-interest's loan to Capitol Hill Subway.

Meanwhile, three members of 12th and John Investors removed its previously appointed manager and appointed a new one. That new manager did not declare that Capitol Hill Subway was in default of its written consent obligations, elect to pursue any remedies, or remove the real estate agent's authorization to sell the development project's condominium units.

Capitol Hill Subway's real estate agent ultimately sold, during the time in question, 49 out of 51 of the development project's condominium units. The proceeds from those sales did not result in sufficient revenue to pay off Broadmark Realty Capital's predecessor-in-interest's loan to Capitol Hill Subway. No portion of the sales proceeds were distributed to 12th and John Investors and the investment owner neither recovered its investment in Capitol Hill Subway nor received a return on that investment.

C

In September 2019, three members of 12th and John Investors, in a derivative action, sought relief against Hardy pursuant to his personal guarantee

8

of 12th and John Investors' investment and promised return. An $8 million default judgment against Hardy resulted. Hardy, however, then filed for bankruptcy and the debt associated with that judgment was discharged.

Then, in April 2020, two members of 12th and John Investors, as individuals, sought relief against 12th and John Investors' former manager, filing an arbitration complaint against him. In response, the former manager requested that the superior court stay that complaint while he demanded arbitration in the venue agreed to in certain of 12th and John Investors' member agreements. The court granted the former manager's motion. However, the two plaintiffs declined to proceed with arbitration in the designated venue, apparently abandoning their claim.

Ultimately, in December 2020, 12th and John Investors filed a complaint in King County Superior Court against both Capitol Hill Subway and Broadmark Realty Capital.[10] Capitol Hill Subway did not enter an appearance in the matter. In April 2021, the trial court granted 12th and John Investors' motion for a default judgment against that company. However, because Capitol Hill Subway was comprised of Hardy, who was bankrupt, and 12th and John Investors, who had not recovered their investment, 12th and John Investors received no funds stemming from that default judgment.

Meanwhile, 12th and John Investors' complaint against Broadmark Realty Capital sought declaratory relief predicated on the theory that 12th and John

_____

[10] This lawsuit was filed more than four years after Capitol Hill Subway and 12th and John Investors signed the writings in question and two and a half years after Capitol Hill Subway had initially agreed to refinance its loans with one of Broadmark Realty Capital's predecessors-in-interest.

9

Investors' agreement with Hardy created an equitable lien against the development property in question, thereby entitling 12th and John Investors to the proceeds stemming from the development project's condominium sales equal to the amount that it alleged that it was owed under that agreement.[11]

In September 2022, Broadmark Realty Capital moved for summary judgment on 12th and John Investors' claims.  12th and John Investors, for its part, moved for partial summary judgment, arguing—for the first time, and more than six and a half years after the writings memorializing the agreement between it and Hardy were signed—that its agreement with Hardy had clearly and unequivocally created an equitable lien attaching to the loan proceeds stemming from Capitol Hill Subway's loan agreements with Broadmark Realty Capital's predecessor-in-interest.

The trial the court issued an order granting Broadmark Realty Capital's motion for summary judgment and denying 12th and John Investors' motion for partial summary judgment.

12th & John Investors now appeals.

II

On appeal, 12th and John Investors asserts that its agreement with Hardy created an equitable lien against loan proceeds stemming from *any* future lender creditor's loan agreements with Capitol Hill Subway in the event that Hardy defaulted on certain of his obligations inhering in his agreement with 12th and

---

[11] 12th and John Investors' complaint also alleged several tort theories against Broadmark Realty Capital's predecessor-in-interest that it reiterates on appeal.

John Investors. Therefore, according to 12th and John Investors, when Hardy defaulted on those obligations in signing Capitol Hill Subway's loan refinance agreements with Broadmark Realty Capital's predecessor-in-interest, 12th and John Investors' agreement with Hardy created an equitable lien against the loan proceeds flowing from those loan agreements that is enforceable against Broadmark Realty Capital.

Two predicates underlie 12th and John Investors' assertion. The first predicate is that 12th and John Investors has a right to enforce certain terms of its agreement with Hardy against Broadmark Realty Capital's predecessor-in-interest, a nonparty to that agreement. The second predicate is that the only commercially reasonable interpretation of 12th and John Investors' agreement with Hardy is that it functioned to create an equitable lien against the specific loan proceeds in question. We discuss the first predicate below and the second predicate in Sections B and C, infra.

A

Again, the first predicate arising from 12th and John Investors' assertion is that 12th and John Investors' agreement with Hardy granted it a right to enforce certain of that agreement's terms against Broadmark Realty Capital's predecessor-in-interest, a company that was not a party to 12th and John Investors' agreement with Hardy.

12th and John Investors does not dispute that Broadmark Realty Capital's predecessor-in-interest was not a signatory to 12th and John Investors' agreement with Hardy. Given that, 12th and John Investors plainly cannot

enforce the terms of its contract with Hardy against Broadmark Realty Capital's predecessor-in-interest on a legal theory predicated at law. See City of Everett v. Estate of Sumstad, 95 Wn.2d 853, 855, 631 P.2d 366 (1981) (a contract is not formed unless the parties have a meeting of the minds).

Nevertheless, "[e]quitable relief is available if there is no adequate remedy at law." Town Concrete Pipe of Wash., Inc. v. Redford, 43 Wn. App. 493, 498, 717 P.2d 1384 (1986) (citing Orwick v. Seattle, 103 Wn.2d 249, 252, 692 P.2d 793 (1984)). Our Supreme Court has cautioned, however, that

> it is a well-established rule that an equitable remedy is an extraordinary, not ordinary, form of relief. HENRY L. MCCLINTOCK, HANDBOOK OF THE PRINCIPLES OF EQUITY § 22, at 47 (2d ed.1948). A court will grant equitable relief only when there is a showing that a party is entitled to a remedy . . . . Orwick v. City of Seattle, 103 Wn.2d 249, 252, 692 P.2d 793 (1984).

Sorenson v. Pyeatt, 158 Wn.2d 523, 531, 146 P.3d 1172 (2006). Additionally, "equitable claims must be analyzed under the specific facts presented in each case." Vasquez v. Hawthorne, 145 Wn.2d 103, 107-08, 33 P.3d 735 (2001). Accordingly, we keep in mind that "equity is defined as '[f]airness; impartiality; evenhanded dealing. . . . The body of principles constituting what is fair and right.'" Delagrave v. Emp. Sec. Dep't, 127 Wn. App. 596, 612, 111 P.3d 879 (2005) (alterations in original) (quoting BLACK'S LAW DICTIONARY 560 (7th ed. 1999)).

Therefore, in order to enforce the terms of its agreement with Hardy against Broadmark Realty Capital, 12th and John Investors must first establish that it is entitled to do so on a legal theory based in equity, that is, based on a

12

theory of what is evenhanded, fair, and right, given the facts of the matter before us.

Here, assuming only for the purpose of this section that 12th and John Investors' proposed interpretation of its agreement with Hardy is correct, the applicable facts according to 12th and John Investors are as follows. 12th and John Investors signed an agreement with Hardy to share ownership of Capitol Hill Subway. As part of that agreement, 12th and John Investors and Hardy agreed between themselves that, in the event that Hardy did not obtain 12th and John Investors' written consent prior to agreeing to refinance a loan on Capitol Hill Subway's development property, 12th and John Investors would have an equitable lien against any future loan proceeds arising from that transaction (up to the amount of its investment and the corresponding return thereon agreed to with Hardy), with a security interest superior to that of any subsequent lender who signed a loan agreement with Capitol Hill Subway and loaned Capitol Hill Subway funds, notwithstanding that lender not being a party to 12th and John Investors' agreement with Hardy and regardless of the fact that the subsequent lender's loan agreement with Capitol Hill Subway did not mention Hardy's arrangement with 12th and John Investors.

These same facts can be put another way: An agreement is reached among co-owners of a debtor entity (Capitol Hill Subway), comprised of the original owner (Hardy) and the preferred investment owner (12th and John Investors). As part of the owners' agreement, the owners decide that, in the event that the debtor entity's original owner (Hardy) defaults on a certain

obligation to the investment owner set forth in that agreement, payment of the profits sought by the investor owner would be prioritized over, and at the expense of, the rights to repayment of future lender creditors of the debtor entity, who will in the future, consistent with future loan agreements between the lender creditor and the debtor entity, loan money to the debtor entity. However, those lender creditors will neither be parties to the agreement between the owners of the debtor entity nor will their loan agreements with the debtor entity reflect that entity's investment owner's priority of payment over that of the lender creditor.

Taking 12th and John Investors' assertion—and its corresponding facts—at face value, such an agreement plainly does not sound in equity. Indeed, it does not appear fair or right that a pair of co-owners can agree amongst themselves to privilege paying one co-owner's "preferred return" over the repayment of a secured loan solicited by the co-owners' company. It also does not appear fair that Hardy and 12th and John Investors themselves would have the ability to impose such a lien—Hardy by not asking for its co-owner's written consent, 12th and John Investors by withholding such consent from its co-owner—with no input from a future lender creditor. It further does not appear fair that the payments from Capitol Hill Subway to 12th and John Investors after the creation of such a lien would be paid out of the loan proceeds themselves before any such payment would issue for the purpose of repaying the loan to the lender who provided the funds in the first instance, for the purpose of paying off prior secured loans, or for the purpose of advancing completion of the project (the very reason that the loan was extended).

Furthermore, 12th and John Investors does not identify a specific basis on which it asserts its entitlement to equitable relief other than its equitable lien theory, to be discussed, infra. Indeed, 12th and John Investors conceded at oral argument that its theory of equity is not predicated on a theory that its agreement with Hardy created an equitable mortgage against the development property in question.[12] And apart from that concession, 12th and John Investors does not provide us with any other equitable basis that, it alleges, supports its right to enforce the terms of its agreement with Hardy against Broadmark Realty Capital's predecessor-in-interest.[13] Thus, apart from its equitable lien theory, 12th and John Investors asserts no other basis in equity as entitling it to relief in this matter.

Given all that, taking the facts underlying 12th and John Investors' assertion at face value, such an assertion does not to us appear remotely equitable. Accordingly, the first predicate underlying 12th and John Investors' assertion appears to proceed on uneven ground.

B

The second predicate upon which 12th and John Investors' assertion relies is that there is only one plausible and commercially reasonable

---

[12] Wash. Court of Appeals oral argument, *12th and John Investors v. Broadmark Realty Capital*, No. 84748-1-I (Jan. 17, 2024), at 5 mins., 38 sec., (on file with court).

[13] 12th and John Investors also indicated at oral argument that it was relying on Speirs v. Jahnsen, 143 Wash. 297, 255 P. 117 (1927), as authority in support of the proposition that two co-owners of a debtor company can contract amongst themselves to prioritize one of the co-owner's payment of "profits" over the right of repayment of a loan issued by a lender who was not a party to such agreement. Such reliance is unavailing. Not only do the facts of that case plainly not involve circumstances remotely similar to the matter before us, the equitable theory discussed in Speirs was an equitable lien, rather than some alternate theory in equity. See Speirs, 143 Wash. at 299-301. Whether the writings in question created an equitable lien is discussed in Section III, infra.

interpretation of the provisions highlighted by 12th and John Investors in its investment and ownership agreement with Hardy, with such interpretation being that those provisions created an equitable lien against the loan proceeds flowing from Broadmark Realty Capital's loan agreements with Capitol Hill Subway. Accordingly, the crux of the matter before us is whether those provisions are subject to more than one plausible and commercially reasonable reading.

On appeal, Broadmark Realty Capital and 12th and John Investors provide differing interpretations of those provisions. Accordingly, we analyze each interpretation in turn.

In reviewing a dispute as to the meaning of contract language on appeal from summary judgment, we first determine whether that contract is ambiguous.

> Whether a contract is ambiguous is a question of law. A contract provision is not ambiguous merely because the parties to the contract suggest opposing meanings. "'If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent; if two or more meanings are reasonable, a question of fact is presented.'" Summary judgment as to a contract interpretation is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning.

GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014) (footnotes and internal quotation marks omitted) (quoting Martinez v. Miller Indus., Inc., 94 Wn. App. 935, 943, 974 P.2d 1261 (1999), and citing Syrovy v. Alpine Res., Inc., 68 Wn. App. 35, 39, 841 P.2d 1279 (1992); Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 421, 909 P.2d 1323 (1995); Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 85, 60 P.3d 1245 (2003)).

We recently described the applicable analysis as follows:

The purpose of contract interpretation is to ascertain the intent of the parties. Roats v. Blakely Island Maint. Comm'n, Inc., 169 Wn. App. 263, 274, 279 P.3d 943 (2012). Washington courts "follow the objective manifestation theory of contracts." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Under this approach, courts "focus on the agreement's objective manifestations to ascertain the parties' intent." Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016). When considering the language of a written agreement, we "impute an intention corresponding to the reasonable meaning of the words used." Hearst Commc'ns, Inc., 154 Wn.2d at 503 (citing Lynott v. Nat'l Union Fire Ins. Co. of Pittsburgh, 123 Wn.2d 678, 684, 871 P.2d 146 (1994)).

The intent of the parties may be discovered from "'the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996) (internal quotation marks omitted) (quoting Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc., 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993)).

Healy v. Seattle Rugby, LLC, 15 Wn. App. 2d 539, 544-45, 476 P.3d 583 (2020).

All writings that are part of the same transaction are interpreted together. Kelley v. Tonda, 198 Wn. App. 303, 311, 393 P.3d 824 (2017) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (AM. LAW INST. 1981)). Furthermore, it has long been established that "[b]usiness contracts must be construed with business sense as they naturally would be understood by intelligent persons of affairs." 17A Am. Jur. 2d Contracts § 386 (2nd ed. 2024 update) (previous edition quoted with approval in Carroll Constr. Co. v. Smith, 37 Wn.2d 322, 331, 223 P.2d 606 (1950)).

1

The agreement in question is memorialized in two writings: the "Amendment to Operating Agreement of Capitol Hill Subway, LLC" (the Amended Operating Agreement) and the "Preferred Equity Investment Agreement" (the Investment Agreement). These writings incorporate one another.[14] The signatories to each writing are Hardy (signing as the "Original Member" of Capitol Hill Subway, on behalf of Capitol Hill Subway, or both) and 12th and John Investors (signing as either Capitol Hill Subway's "Preferred Member" or as "Investor"). Notably, neither respondent Broadmark Realty Capital nor any of its predecessors-in-interest are a signatory to these writings or are expressly mentioned therein.

As identified in the recitals of the co-owners' Amended Operating Agreement, the co-owners' reasons for signing that writing are as follows:

> [A]s of [February 26, 2016], [Hardy] owns all of the issued ownership interests in [Capitol Hill Subway] . . . .
>
> [Capitol Hill Subway], with the consent of [Hardy], wishes to admit [12th and John Investors] to [Capitol Hill Subway], effective as of [February 26, 2016] in accordance with the terms and conditions of that certain Preferred Equity Investment Agreement by and among [Capitol Hill Subway] and [12th and John Investors] . . . ; and
>
> [Capitol Hill Subway], [Hardy], and [12th and John Investors] desire to amend the Operating Agreement to provide for such admission, and *to otherwise specify the new series of membership interests issued to [12th and John Investors] effective from and after [February 26, 2016].*

---

[14] The Investment Agreement also provides that "the provisions of [the Investment Agreement] shall control, except that, in the case of an irreconcilable conflict between the [Amended Operating Agreement] and [the Investment Agreement], the [Amended Operating Agreement] will control."

(Emphasis added.) That writing designated 12th and John Investors' new membership interests in Capitol Hill Subway as "Preferred Member Units":

> [Capitol Hill Subway] has issued Company Interests designated as the "Preferred Member Units" (the "Preferred Member Units") to [12th and John Investors], with the Stated Value as set forth in Section 13. The Preferred Member Units shall be Company Interests and shall constitute a separate class thereof. [12th and John Investors] will be the owner and holder of one hundred percent (100%) of the Preferred Member Units issued and outstanding on the Amendment Date.

"Stated Value" was defined as a value of $3,222,222. That writing further provided that 12th and John Investors, as holders of Preferred Member Units, were "entitled to receive the Preferred Unit Return," a return of 30 percent compounded annually.

The Investment Agreement's recitals, for their part, state that the parties are contracting with one another because "[Capitol Hill Subway] desires to obtain the Investment from [12th and John Investors]," and "[12th and John Investors] is willing to make *the Investment* in [Capitol Hill Subway], subject to and strictly in accordance with the terms of this Agreement and the Exhibits attached hereto." (Emphasis added.) That writing's recitals further state that 12th and John Investors is signing the writing in question with Capitol Hill Subway so that the "*Investment may be redeemed* as set forth in the [Amended Operating Agreement] (as defined herein) for *the Redemption Price* or *the Early Redemption Price*, as applicable, as those terms are defined in the [Amended Operating Agreement], which includes as a component the Stated Value (as

defined in the [Amended Operating Agreement]) of $3,222,222." (Emphasis added.)[15]

The Investment Agreement defines "Investment" as the "Investment made by [12th and John Investors] to [Capitol Hill Subway] pursuant to this Agreement in the amount of $2,900,000." The "Redemption Price" is defined as "an amount equal to the sum of (i) the Stated Value plus (ii) any accrued but unpaid Preferred Unit Return plus (iii) the Project Value Payment," with the "Project Value Payment" defined as an amount "equal to fifty percent (50%) of the net value of the project." The "Early Redemption Price" is defined as

> equal to the sum of (i) the Stated Value plus (ii) an imputed Preferred Member Return on the Preferred Member Units for a period of one (1) year from the date of issuance of the Preferred Member Units to [12th and John Investors]. In such instance, [Capitol Hill Subway] does not have to pay the Project Value Payment to redeem the Preferred Member Units.

2

The writings in question also set forth numerous terms and conditions. As applicable here, the writings oblige Capitol Hill Subway to obtain 12th and John Investors' written consent prior to performing certain actions. For instance, the Investment Agreement requires that Capitol Hill Subway receive such consent from 12th and John Investors prior to committing or allowing waste of the property in question, allowing liens to be imposed or maintained against such property, before changing the development project's budget or plan, filing

---

[15] The Amended Operating Agreement also provided that 12th and John Investors' membership interests could be redeemed by Capitol Hill Subway for the Redemption Price or the Early Redemption Price.

bankruptcy, or confessing judgment against Capitol Hill Subway. That writing also obliges Capitol Hill Subway to obtain such consent from 12th and John Investors prior to violating its own organization documents, purchasing certain properties or assets, changing its development property's use or zoning classifications, or allowing certain illegal operations or occupations of such property. That writing further obliges Capitol Hill Subway to obtain such consent prior to engaging in mergers, distributions, liquidations, purchases, or other changes to its properties or assets, taking on additional loans and encumbrances, or making certain changes with respect to the ownership of the development property in question. The Amended Ownership Agreement, for its part, sets forth provisions paralleling the aforementioned circumstances as ones for which Capitol Hill Subway is required to obtain 12th and John Investors' written consent.[16]

The terms and conditions of the writings in question also contain several provisions predicating Capitol Hill Subway's performance of certain obligations on whether it has redeemed 12th and John Investors' investment.[17] For instance, the Investment Agreement conditions the nine representations and warranties listed therein on whether "any portion of the Redemption Price

---

[16] The Amended Ownership Agreement obliges Capitol Hill Subway to obtain written consent from 12th and John Investors prior to terminating a receivership, creating, issuing, or reclassifying certain company interests, securities, or company units, merging with another entity, transferring or leasing its assets, making changes to the Amended Operating Agreement, acquiring an interest in land or property, financing or refinancing the property, filing or consenting to the filing of a bankruptcy petition, confessing judgment against the company, or making certain decisions relating to tax matters.

[17] We use the phrase "redemption of 12th and John Investors' investment" to refer to any payment by Capitol Hill Subway in the manner specified in the writings in question—including payment of the Redemption Price or Early Redemption Price—that would serve to buy back its interest from 12th and John Investors as set forth in the co-owners' writings.

remains unpaid and [12th and John Investors] remains a Preferred Member of [Capitol Hill Subway]." That writing also conditions all 19 of Capitol Hill Subway's operational covenants to 12th and John Investors as being in effect "[f]rom the date hereof and until the indefeasible payment of the Redemption Price or the Early Redemption Price, as applicable, in full."[18] That writing also conditions all of Capitol Hill Subway's entity covenants to 12th and John Investors as being in effect "[u]ntil the Redemption Price or the Early Redemption Price, as applicable, has been paid in full" and as surviving "for so long as any amount remains payable to [12th and John Investors] under this Agreement or any other Investment Document." That writing also conditions Capitol Hill Subway's ability to sell or encumber the property in question "[u]nless and until the Redemption Price or the Early Redemption Price, as applicable, is paid in full out of the proceeds of any such transaction." That writing also indicates that

> [t]his Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by [12th and John Investors] of the Investment and the execution and delivery of the Investment Documents, and shall continue in full force and effect *so long as all or any of the Redemption Price is outstanding and unpaid*.

(Emphasis added.)

---

[18] In addition to written consent being required for deviations from any of the operational covenants, certain of those covenants also expressly conditioned themselves on Capitol Hill Subway's redemption of 12th and John Investors' investment. For instance, Section 11 ("Property Reports") indicated that "[s]o long as the Investment remains outstanding, [Capitol Hill Subway] shall . . . provide [12th and John Investors] with complete copies of all Property Reports"; Section 12 ("Leasing and Property Management") set forth that "[a]t all times prior to the indefeasible payment of the Redemption Price, [Capitol Hill Subway] shall manage the Property . . ."; and Section 17 ("Negative Covenants") provided that "at all times prior to the indefeasible payment in full of the Redemption Price, [Capitol Hill Subway] shall not . . . ."

The Amended Operating Agreement also contains provisions predicating certain of Capitol Hill Subway's obligations on whether 12th and John Investors' investment has been redeemed. This includes, in the event of a liquidation of Capitol Hill Subway's assets, conditioning 12th and John Investors' right or claim against such assets on "payment of the full amount of the liquidating distributions to which they are entitled," and conditioning the procedures of the redemption process itself on whether "[Capitol Hill Subway] pays [12th and John Investors] in cash funds sufficient to pay the applicable Redemption Price or the Early Redemption Price." That writing also specifies that, "[s]o long as any Preferred Member Units remain outstanding," Capitol Hill Subway cannot create, issue, or reclassify certain company interests, securities, or company units, merge with another entity, transfer or lease its assets, make changes to the Amended Operating Agreement, acquire an interest in land or property, finance or refinance the development property in question, file or consent to the filing of a bankruptcy petition, or confess judgment against itself. That writing further provides that

> *[s]o long as all or any of the Redemption Price is outstanding and unpaid* unless a longer period is expressly set forth herein, the Investment Agreement and all covenants, agreements, representations and warranties made therein shall survive the execution and delivery of this Amendment, shall continue in full force and effect and the terms and conditions of the Investment Agreement are hereby incorporated into this Amendment as if set out here in their entirety.

(Emphasis added.)

3

In addition, the writings in question each contain dedicated default and remedy sections, with the Amended Operating Agreement setting forth a section titled "Default and Remedies" and the Investment Agreement setting forth a section titled "Events of Default; Remedies." The Amended Operating Agreement's "Default" subsection lists five specific events of default and provides two catch-all events of default.[19] Those catch-all provisions read as follows:

> Default. [*Capitol Hill Subway] shall [be] in default* ("Default") under this Agreement if (A) [Capitol Hill Subway] fails to make *any* payment when due under this Agreement; (B) there is a default under, a breach of, or failure to perform *any other covenant, agreement or obligation to be performed* under this Agreement or any other agreement (including any Investment Agreement) to which [Capitol Hill Subway] and [12th and John Investors] is a party.

(Emphasis added.) Similarly, the other writing's parallel section details 11 specific events of default and provides a catch-all event of default provision.[20] That provision is titled "Other Defaults" and reads that an event of default occurs if Capitol Hill Subway fails "to perform *any other obligation* not involving the payment of money under any Investment Document, or to *comply with any other*

---

[19] The listed events of default detailed in the Amended Operating Agreement regard Capitol Hill Subway's failure to pay its debts, the discovery of a false or misleading representation or warranty by Capitol Hill Subway, its filing of an involuntary bankruptcy petition, and its dissolution.

[20] The first four listed events of default in the Investment Agreement regard Capitol Hill Subway's failure to pay certain monies to 12th and John Investors. The remaining specified events of default generally parallel those specifically identified in the other writing: the discovery of a false or misleading representation or warranty by Capitol Hill Subway, its failure to pay its debts, its filing of an involuntary bankruptcy petition, its dissolution, its being levied by legal process, its assertion that the agreements are invalid, or its failure to deliver financial reports to 12th and John Investors.

*term or condition applicable to [Capitol Hill Subway]* under any Investment

Document." (Emphasis added.)

Each writing also sets forth distinct provisions linking a default by Capitol

Hill Subway to those remedies made available to 12th and John Investors in the

co-owners' writings. In the Investment Agreement, the "Remedies" section

initially provides that,

> *[u]pon the occurrence* and during the continuance *of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to [12th and John Investors]* against [Capitol Hill Subway] *under this Agreement or any of the other Investment Documents* executed and delivered by, or applicable to, [Capitol Hill Subway], or at law or in equity, *may be exercised by [12th and John Investors]* at any time and from time to time, whether or not the Redemption Price shall be declared due and payable, and whether or not Investor shall have commenced any other action for the enforcement of its rights and remedies under any of the Investment Documents.

(Emphasis added.) Similarly, the Amended Ownership Agreement includes a

subsection titled "Remedies," which states that,

> [i]mmediately upon or any time after the occurrence and during the continuance of *any Default* hereunder, [12th and John Investors] *may* exercise any remedy available at law or in equity, including but not limited to those listed below in such sequence or combination as [12th and John Investors] *may determine in [12th and John Investors'] sole discretion.*

(Emphasis added.) The list of remedies identified thereafter are performance of

default obligations, specific performance and injunctive relief, acceleration of

Redemption Date, suit for monetary relief, possession of real property, and

appointment of receiver. The writings' remedies sections also contain catch-all

provisions identifying that, as pertinent here, 12th and John Investors' remedies

were cumulative, that it could proceed against Hardy's guarantee, and that it retained "any rights or remedies available at law or in equity."

C

The dispute before us regards parallel contractual provisions located in each of the writings in question. One of those provisions, set forth in the Amended Operating Agreement, provides, in pertinent part, as follows:

> 7.      Voting and/or Consent Rights. *So long as any Preferred Member Units remain outstanding*, without the written consent of [12th and John Investors], [Capitol Hill Subway] shall not . . . finance or refinance the Property and the operations of [Capitol Hill Subway] and enter into, amend or modify the terms and conditions of any loan obtained by [Capitol Hill Subway], including the Senior Loan (if any), *other than to the extent [that] the proceeds of such financing or refinancing are used to redeem in full the outstanding Preferred Member Units*.

(Emphasis added.)  The other provision, in the Investment Agreement, reads as follows:

> **Section 7.1  No Sale/Encumbrance**
>
> (a)      Prohibited Transfers.  As an inducement to [12th and John Investors] to make the Investment, and except as otherwise allowed herein, [Capitol Hill Subway] covenants and agrees that during the term of the Investment, title to the Property and to every portion thereof shall be vested solely in [Capitol Hill Subway] (as it is presently constituted).  *Unless and until the Redemption Price or the Early Redemption Price, as applicable, is paid in full out of the proceeds of any such transaction*, [Capitol Hill Subway] shall not, without the express prior written consent of [12th and John Investors] cause, permit, or consent to the sale, transfer, encumbrance, pledge or other disposition of the Property, or any portion thereof, or to any change in the direct or indirect ownership of [Capitol Hill Subway].[21]

---

[21] We assume, for the purposes of our decision, that Capitol Hill Subway's loan refinances with Broadmark Realty Capital's predecessor-in-interest during the time in question constituted an encumbrance on Capitol Hill Subway's development property pursuant to the foregoing provisions.

(Emphasis added.)

1

Broadmark Realty Capital asserts that a commercially reasonable interpretation of the provisions at issue is that 12th and John Investors and Hardy intended to condition Capitol Hill Subway's performance of the loan refinance written consent obligations therein on whether Capitol Hill Subway had redeemed 12th and John Investors' interest in Capitol Hill Subway for the applicable price. Broadmark Realty Capital further asserts that, because the text of the provisions in question does not expressly identify terms of default or available remedies, a reasonable interpretive inference arising from such absence is that the co-owners intended to incorporate the dedicated default and remedies sections in their writings into the provisions in question. As next explicated, Broadmark Realty Capital's proposed interpretation is both commercially reasonable and plausible.

i

As an initial matter, Broadmark Realty Capital's interpretation is consistent with the titles, parties, and objectives identified in the writings in question. Those titles suggest that the co-owners intended to reach an agreement regarding the making of an equity investment and the amending of a company's ownership structure. The provisions in question explicitly identify Capitol Hill Subway and 12th and John Investors as the applicable entities, including Capitol Hill Subway as the "Company" and 12th and John Investors as the "Investor." Additionally, the objectives reflect that Capitol Hill Subway was willing to share ownership and

subject itself to certain terms and conditions in order to receive 12th and John Investors' investment and that 12th and John Investors wished to provide such an investment and have that investment redeemed for an appropriate price. Given that, the foregoing suggests that the parties intended to agree to an investment and ownership agreement that was predicated on whether Capitol Hill Subway had redeemed 12th and John Investors' investment, i.e., repurchased its interest from 12th and John Investors for the applicable price as set forth in the co-owners' writings.

Put another way, it follows from the foregoing that 12th and John Investors and Capitol Hill Subway intended that 12th and John Investors would either be "in" as a member of Capitol Hill Subway or "out," with 12th and John Investors' membership status depending on whether Capitol Hill Subway had repurchased its interest in itself from 12th and John Investors for the appropriate price. For instance, in the event that Capitol Hill Subway had not bought back such membership interest, then 12th and John Investors were "in" as members of Capitol Hill Subway, with all of the corresponding membership rights and authority to enforce Capitol Hill Subway's obligations, thereby preserving the possibility that Capitol Hill Subway might yet redeem its investment.[22] Conversely, in the event that Capitol Hill Subway repurchased such membership interest, then 12th and John Investors would be "out" as members of Capitol Hill Subway, receiving the applicable sum of its investment and return but losing its

---

[22] Indeed, the writings reflect that, as long as 12th and John Investors remains a member of Capitol Hill Subway, it had a right to receive distributions of returns on its investment obtained from the operations or the sale of the property in question.

28

rights and authority over Capitol Hill Subway arising from its membership therein.[23]

Given all that, Broadmark Realty Capital's interpretation is plainly consistent with the titles, parties, and objectives evidenced within the writings in question.

ii

Broadmark Realty Capital's interpretation is also consistent with the terms and conditions set forth in the provisions at issue both by themselves and when read alongside similarly worded provisions within the writings in question.

An "obligation" is defined as including "[a] legal . . . duty to . . . not do something. . . .  It may refer to anything that a person is bound to . . . forebear from doing, whether the duty is imposed by law [or] contract."  BLACK'S LAW DICTIONARY, 1292 (11th ed. 2019) (emphasis added).  A condition subsequent may arise in a contract when the parties intend that "the occurrence of an event . . . will extinguish a duty after performance has become due, along with any claim for breach."  RESTATEMENT (SECOND) CONTRACTS § 224 cmt. e (1981); see also BLACK'S LAW DICTIONARY 367 (11th ed. 2019) ("A condition that, if it occurs, will bring something else to an end; an event the existence of which, by agreement of the parties, discharges a duty of performance that has arisen.").[24]

---

[23] Further suggesting that the parties intended that 12th and John Investors only be involved in Capitol Hill Subway to the extent that its investment was not yet redeemed, the writings provide that 12th and John Investors is not liable for Capitol Hill Subway's debts, obligations, or liabilities, and that 12th and John Investors is not obligated to provide additional funds to Capitol Hill Subway.

[24] See, e.g., Fleming v. August, 48 Wn.2d 131, 135, 291 P.2d 639 (1955) ("[I]f it is agreed that the contract will cease to be binding if some event occurs in the future, then it is delivered upon a condition subsequent."); City Nat'l Bank of Anchorage v. Molitor, 63 Wn.2d 737, 744, 388

As an initial matter, some of the highlighted text in the provisions at issue are those provisions' written consent clauses. As applicable here, those provisions indicate that, "without the written consent of [12th and John Investors], [Capitol Hill Subway] shall not" refinance its development property's loans, and, similarly, that "[Capitol Hill Subway] shall not, without the express prior written consent of [12th and John Investors]," refinance its development property's loans.

It is plainly a reasonable interpretation of the foregoing clauses that the parties intended to impose an obligation on Capitol Hill Subway (i.e., Hardy)— that is, an obligation to not refinance loans on the development property without also obtaining 12th and John Investors' written consent to do so. This clearly follows from reading each of the constituent parts together: the clauses set forth an obligation indicating that "[Capitol Hill Subway] shall not" refinance the development property's loans, and each of those clauses contains a modifier conditioning that obligation on whether Capitol Hill Subway has received 12th and John Investors' written consent. Read together, a reasonable interpretation of that portion of the foregoing provisions is that they set forth a loan refinance written consent obligation against Hardy, acting as manager of Capitol Hill Subway.

This reading is consistent with the similarity in structure between the foregoing written consent clauses and other written consent clauses located

---

P.2d 936 (1964) ("'A fact is a condition subsequent to the legal relation that it extinguishes.'" (italics omitted) (quoting 3A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 739 (1952)).

throughout the writings in question. Indeed, other clauses scattered throughout the writings in question, discussed above, similarly prohibit Capitol Hill Subway— i.e., Hardy—from taking certain action unless written consent to do so was obtained, setting forth prohibitions on Hardy taking actions relating to entity structure, assets, liens, legal action, and more. The similarity in structure suggests that the co-owners did not intend for the numerous written consent obligation clauses—including those clauses at issue—to operate in a manner materially distinct from one another.

Moreover, the provisions at issue do not set forth any additional language expressly indicating that—despite these similarities—the co-owners intended for those provisions to operate in a manner materially distinct from other similar such provisions. Given that, it is a reasonable reading of the written consent portion of the provisions at issue that they impose a contractual obligation against Hardy to obtain 12th and John Investors' written consent prior to refinancing Capitol Hill Subway's loans on its development property.

Turning to the first conditional clause in the Amended Operating Agreement that precedes the written consent obligation therein, it is plainly a reasonable reading of such a clause that it sets forth a condition subsequent to Hardy's written consent obligation. As set forth above, that first clause prefaces the remainder of the provision that follows with the phrase: "So long as any Preferred Member Units remain outstanding." When the phrase "So long as" is read alongside "any Preferred Member Units remain outstanding" and is followed by a description of Hardy's obligation to obtain 12th and John Investors' written

consent prior to refinancing Capitol Hill Subway's loans, this suggests a reading that, as long as Capitol Hill Subway has not repurchased 12th and John Investors' membership interest in that company, Hardy would be obligated to obtain 12th and John Investors' written consent prior to refinancing Capitol Hill Subway's loans. Put another way, that same clause could be read to indicate that Hardy—acting as manager of Capitol Hill Subway—must obtain 12th and John Investors' written consent for a loan refinancing, unless Capitol Hill Subway has *previously* repurchased 12th and John Investors' membership interest. Such a reading is consistent with the reading of the contractual objectives, discussed above, that, if Capitol Hill Subway had purchased 12th and John Investors' interest, then 12th and John Investors would be "out" as a member of Capitol Hill Subway, thereby extinguishing, among else, Capitol Hill Subway's loan refinance written consent obligation to 12th and John Investors.

As with the similarities between the written consent obligations in the co-owners' writings, this reading is consistent with the similarity in structure between the foregoing clause and other condition subsequent clauses located throughout the writings in question. As set forth above, the writings in question contain numerous provisions that contain conditional language the same or similar to "so long as"—e.g., "so long as," "for as long as," "until," "unless and until," "from the date hereof and until"—and those provisions invoke similar terminology regarding 12th and John Investors' membership interest in Capitol Hill Subway—e.g., Preferred Member Units, Redemption Price, Early Redemption Price, Investment.

The similarity in structure suggests that the co-owners did not intend for those condition subsequent clauses—including the clauses at issue—to operate in a manner materially distinct from one another. Again, the provisions at issue do not set forth any additional language expressly indicating that—despite these similarities—the co-owners intended for the condition subsequent provision at issue to operate in a manner materially distinct from other similar such provisions. Therefore, it is a reasonable interpretation of the initial clause of the provision at issue within the Amended Operating Agreement that it sets forth a condition subsequent to Capitol Hill Subway's loan refinance written consent obligation, one that extinguishes that obligation in the event that Capitol Hill Subway has repurchased 12th and John Investors' membership interest for the applicable price.[25]

Turning now to the remaining conditional clauses in both of the writings' provisions at issue, it is a reasonable reading of those clauses that they set forth a condition subsequent unique to both Hardy's loan refinance written consent obligation to 12th and John Investors' and Capitol Hill Subway's ability to buy back 12th and John Investors' membership interest using the proceeds from such a transaction. Again, those clauses read as follows: "other than to the extent [that] the proceeds of such financing or refinancing are used to redeem in full the outstanding Preferred Member Units," and "Unless and until the

---

[25] Although only the provision at issue within the Amended Operating Agreement contains this preliminary clause, it is a reasonable interpretation that the parties intended to incorporate this clause into both writings, given that the writings were part of the same transaction, incorporated one another, and do not conflict on this basis. Furthermore, even if they did conflict, the writings expressly indicate that the Amended Operating Agreement—the writing containing the foregoing clause in the provision at issue—would control.

Redemption Price or the Early Redemption Price, as applicable, is paid in full out of the proceeds of any such transaction."

These clauses contain conditional phrasing—"other than to the extent" and "unless and until"—and membership interest terminology—"Preferred Member Units," "Redemption Price," or the "Early Redemption Price"—materially similar to the condition subsequent clauses analyzed above. Although, unlike the other such clauses, they mention the phrase "loan proceeds," these clauses can reasonably be understood as simply another type of condition subsequent regarding Capitol Hill Subway's redemption of 12th and John Investors' interest through payment out of loan proceeds, rather than payment with other sources of funds. Indeed, given that the topic of the provisions at issue is a loan refinance and that one of the contractual objectives was for Capitol Hill Subway to redeem 12th and John Investors' membership interest, it follows that such a provision could reasonably be interpreted as a condition subsequent extinguishing Hardy's loan refinance written consent obligation to 12th and John Investors in the event that Capitol Hill Subway redeemed 12th and John Investors' interest therein *using the proceeds of the exact same loan refinance*. Pursuant to this interpretation, the clauses at issue operate to add another circumstance through which 12th and John Investors could be "in" or "out" as members of Capitol Hill Subway: if Capitol Hill Subway used the loan proceeds to repurchase its interest from 12th and John Investors, then that investment company would be "out" as a member of Capitol Hill Subway. Conversely, if Capitol Hill Subway did not use

those loan proceeds to repurchase such interest, 12th and John Investors would remain "in" as a member with all of the corresponding rights.

Taken together, a reasonable construction of the provisions at issue is that they set forth two conditions subsequent and one obligation that, together, reflect the following intention: Capitol Hill Subway must obtain 12th and John Investors' written consent prior to refinancing the development property's loans, unless Capitol Hill Subway had already redeemed 12th and John Investors' investment ("So long as any Preferred Member Units remain outstanding") or Capitol Hill Subway uses the proceeds from such loan refinance to redeem 12th and John Investors' investment ("[O]ther than to the extent [that] the proceeds of such financing or refinancing are used to redeem in full the outstanding Preferred Member Units," and "Unless and until the Redemption Price or the Early Redemption Price, as applicable, is paid in full out of the proceeds of any such transaction").[26]

iii

In addition, the presence of dedicated default and remedy sections in the writings in question is also consistent with Broadmark Realty Capital's interpretation of the provisions at issue. Although the text of the provisions in question do not expressly define a default or the remedies available in the event of such a default, each of the writings themselves have dedicated default and remedy sections that explain such absence in the provisions in question. As

---

[26] Indeed, it makes little business sense—and 12th and John Investors has not offered an alternative explanation—for 12th and John Investors and Hardy to have agreed to require Hardy to obtain 12th and John Investors' written consent for a loan refinance *after* 12th and John Investors' interest in Capitol Hill Subway had been redeemed.

detailed above, the default sections broadly define an event of default as including *any* failure by Capitol Hill Subway to perform *any* obligation under *any* agreement between the co-owners. Similarly, the writings' remedies sections identify that 12th and John Investors' right to seek *any* of the remedies specified in those sections arises from *any* event of default by Capitol Hill Subway. Additionally, these provisions granted to 12th and John Investors the discretion to pursue the remedies set forth in the co-owners' writings. Indeed, the writings in question provide that such rights "*may* be exercised by" 12th and John Investors and that the investment company "*may* exercise any remedy available at law or in equity, including but not limited to those listed below in such sequence or combination as [12th and John Investors] *may determine in [12th and John Investors'] sole discretion*." (Emphasis added.)

It is clearly a reasonable interpretation that the writings' default and remedies sections would apply to a circumstance in which Capitol Hill Subway defaulted on its obligation to obtain 12th and John Investors' written consent prior to refinancing a loan on the development property. Indeed, the loan refinance written consent obligation could reasonably be understood as being encompassed within the phrase "any" obligation. Moreover, Capitol Hill Subway's failure to perform in accordance with such an obligation could reasonably be understood as constituting "any" event of default, and the writings provided many remedies that could provide reasonable relief, including, but not limited to, forcing a sale of the development property itself or taking over Capitol Hill Subway's operations. Given that no text in the provisions at issue expressly

36

reflect an intention to be excepted from these broad definitions, it is a reasonable interpretation of the writings in question that the co-owners intended to incorporate into such provisions the writings' dedicated default and remedies sections.

iv

Broadmark Realty Capital's proposed interpretation is also consistent with the co-owners' performance after signing the writings in question.

Our Supreme Court has stated that "'[t]he first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than retrospect—*for, when money disputes have arisen the perspective is apt to be clouded by the unexpected chance of gain or self interest.*'" Long-Bell Lumber Co. v. Nat'l Bank of Commerce of Seattle, 35 Wn.2d 522, 529, 214 P.2d 183 (1950) (emphasis added) (quoting WASHINGTON ANNOTATIONS TO THE RESTATEMENT OF CONTRACTS § 230). Furthermore, "the interpretation which one party, by conduct, adopted as its interpretation, and *which conduct was not disputed for several years by the other party*, is a weighty consideration and helpful in determining what intentions the parties manifested." Long-Bell Lumber Co., 35 Wn.2d at 537 (emphasis added).

Here, the foregoing interpretation of the provisions in question suggests that, in the event that Capitol Hill Subway defaulted on its obligation to obtain 12th and John Investors' written consent prior to refinancing a loan on the development property, 12th and John Investors would view itself as having the

option of either (1) declaring a default and seeking relief or (2) waiting to see how the loan refinance turns out, opting for a chance that Capitol Hill Subway would nevertheless obtain the funds necessary to buy back its membership interest from 12th and John Investors, despite the occurrence of such a default.

12th and John Investors' conduct after signing the writings in question is consistent with the foregoing interpretation of those writings. As detailed herein, 12th and John Investors did not object when, in April 2018, Hardy refinanced Capitol Hill Subway's loans with one of Broadmark Realty Capital's predecessors-in-interest after Trez Capital indicated that it was ceasing its loan disbursements to Capitol Hill Subway. Assuming Hardy placed Capitol Hill Subway in default by doing so without also obtaining 12th and John Investors' written consent, the investor owner's conduct was consistent with an election of waiting and seeing, taking a chance that the loan refinance would, eventually, lead to redemption of its interest. Thereafter, in response to several other instances in which Hardy further encumbered the development property without 12th and John Investors' written consent, the investor owner again elected to wait and see, rather than declare a default.

Additionally, 12th and John Investors' December 2018 letter to Capitol Hill Subway notifying it that it was in default of their agreement is also consistent with the foregoing interpretation. Indeed, 12th and John Investors not only expressly reiterated its discretion pursuant to the co-owners' writings but also implicitly confirmed that it was aware that it had such discretion at all times prior to the sending of the letter. Furthermore, 12th and John Investors' conduct after

sending the letter was also consistent with the above interpretation, because the investment company again exercised its discretion, electing not to seek relief against Capitol Hill Subway and waiting to see whether the proceeds from the condominium sales resulted in its interest being redeemed.

Furthermore, 12th and John Investors' litigation strategy was also consistent with the foregoing interpretation. Indeed, when it became clear that the condominium sales proceeds would not result in the redemption of its investment, 12th and John Investors initiated litigation against Hardy based on his guarantee of its investment as set forth in the writings in question. It was not until deep in litigation, years after it signed the writings in question, that 12th and John Investors asserted, for the first time, an alternate interpretation of the co-owners' writings inconsistent with the foregoing interpretation. Such acquiescence followed by such a significant change in its alleged understanding of its agreement with Hardy years after such an agreement was reached is a weighty consideration in determining the intentions manifested by 12th and John Investors' and Capitol Hill Subway's writings in this matter. See Long-Bell Lumber Co., 35 Wn.2d at 529.

Given all that, Broadmark Realty Capital's proposed interpretation of the co-owners' writings is commercially reasonable and plainly well-supported by those writings. Thus, because there exists a reasonable interpretation of those writings that does not involve the creation of an equitable lien, 12th and John Investors fails, in this way, to establish the second predicate for its assertion on appeal. We nevertheless turn to 12th and John Investors' proposed

interpretation of the co-owners' writings to determine the reasonableness of that interpretation.

2

12th and John Investors asserts that a reasonable interpretation of the provisions in question is that they reflect an unequivocal intent between Capitol Hill Subway and 12th and John Investors to create an equitable lien—a specific interest in property as a remedy for a debt—against any future loan proceeds flowing from Capitol Hill Subway's failure to obtain 12th and John Investors' written consent prior to doing so. Thus, according to 12th and John Investors, the parties intended to create an equitable lien against Broadmark Realty Capital's predecessor-in-interest's loan proceeds disbursed to Capitol Hill Subway because, according to 12th and John Investors, Capitol Hill Subway had failed to obtain the investment company's written consent prior to agreeing to such loan agreements. Because that interpretation is—for several reasons— neither a commercially reasonable nor plausible interpretation of the co-owners' intention underlying their agreement, 12th and John Investors' assertion fails.

Our Supreme Court has stated that "an equitable lien is a remedy for debt determined to be owed in law." Sorenson, 158 Wn.2d at 537 (citing Nelson v. Nelson Neal Lumber Co., 171 Wash. 55, 61, 17 P.2d 626 (1932); Ellenburg v. Larson Fruit Co., 66 Wn. App. 246, 252, 835 P.2d 225 (1992)). Indeed, "'[a]n equitable lien is the right to have property subjected in a court of equity to the payment of a claim. . . . It is neither a debt nor a right of property but *a remedy for a debt*.'" Monegan v. Pac. Nat'l Bank of Wash., 16 Wn. App. 280, 287, 556

P.2d 226 (1976) (emphasis added) (second alteration in original) (internal quotation marks omitted) (quoting Nelson, 171 Wash. at 61).

Such liens, according to a scholar on the law of remedies, may be created "*by express or at least implied-in-fact agreement* of the parties, as where a borrower agrees that a certain fund or piece of property will stand as security for his debt." DAN B. DOBBS, LAW OF REMEDIES: DAMAGES–EQUITY–RESTITUTION § 4.3(3), at 600-01 (2d ed. 1993) (emphasis added).[27] "[W]hen it is not created by express terms," an equitable lien "must arise by necessary implication[] from the terms of the agreement construed with reference to the situation of the parties and the attendant circumstances." Am. Sav. Bank & Tr. Co. v. Lawrence, 114 Wash. 198, 201, 194 P. 971 (1921) (citing Walker v. Brown, 165 U.S. 654, 664, 17 S. Ct. 453, 41 L. Ed. 865 (1897)). Such necessary implication arises when "it *clearly* appears from the contract as a whole that security was intended, for equity will imply a security without express recital if from the nature of the contract it *clearly* appears that such was the intention of the parties." Speirs v. Jahnsen, 143 Wash. 297, 301, 255 P. 117 (1927) (emphasis added) (citing Am. Sav. Bank & Tr. Co., 114 Wash. at 201; Hossack v. Graham, 20 Wash. 184, 55 P. 36 (1898)). Indeed, such intent "must appear unequivocally." Huber v. Coast Inv. Co., 30 Wn. App. 804, 808, 638 P.2d 609 (1981) (citing Redemptorist Fathers v. Purdy, 174 Wash. 358, 361, 24 P.2d 1089 (1933); Beaulaurier v. Buchanan, 16 Wn. App. 887, 889, 559 P.2d 1372 (1977)).

---

[27] Such liens "create no estate or property in the thing to which they attach; they provide no basis for a possessory action either against the debtor or his obligor or fund holder, as in the case of a perfected assignment." Monegan, 16 Wn. App. at 287.

In addition, Division Two of this court has emphasized that "[a]lthough no particular form is required to give rise to an equitable lien, *the parties must have intended to impress a particular fund or thing* with a charge as security for an underlying debt or obligation." Kinne v. Kinne, 27 Wn. App. 158, 162, 617 P.2d 442 (1980) (emphasis added) (citing Monegan, 16 Wn. App. at 287). This is in accordance with persuasive authority from the Ninth Circuit:

> "An equitable lien can be established and enforced only if there is some property which is subject to the lien." RESTATEMENT OF RESTITUTION § 161 comment e (1937). See also Spring Constr. Co., Inc. v. Harris, 562 F.2d 933, 937 (4th Cir.1977) (must have an identifiable res in order for an equitable lien to attach).

Bonneville Power Admin. v. Wash. Pub. Power Supply Sys., 956 F.2d 1497, 1507 (9th Cir. 1992) (holding that "[i]n this case there is no 'identifiable res' on which a lien can be imposed, because the allegedly misallocated funds have been disbursed"); accord DOBBS, supra, § 6.1(2) at 5 ("An equitable lien is a lien placed upon specific funds or property to secure the plaintiff's rights to restitution in money. . . . provided the funds or the property for which they have been exchanged can be identified."); see also DOBBS, supra, § 6.1(3) at 11-14 (discussing tracking or tracing proceeds for the purpose of an equitable lien).

In that regard, Speirs v. Jahnsen, 143 Wash. 297, is instructive. There, the matter before our Supreme Court involved a developer and a builder agreeing that a property deed, conveyed to the builder as consideration for their agreement, would be held in escrow as security for the builder's completion of a construction project. Speirs, 143 Wash. at 297-99. The court determined that

the parties' writings unequivocally reflected an intention to create an equitable lien against the deed in question, reasoning as follows:

> That it was the intention of the parties in this instance, that the Kirkland property should be held by the respondent as security for the faithful performance of the contract on the part of [the builder], would hardly seem to admit of doubt. *The agreement that the deed should remain in escrow until the completion of the building, could hardly have had any other purpose.*

Speirs, 143 Wash. at 301 (emphasis added).[28]

i

As an initial matter, the parties, signatories, and titles of the writings in question do not clearly and unequivocally demonstrate the co-owners' intent to create an equitable lien against loan proceeds disbursed by Broadmark Realty Capital's predecessor-in-interest. Significantly, the parties identified as signatories to those writings include neither Broadmark Realty Capital nor its predecessor-in-interest. Furthermore, the objectives identified by the parties do not set forth any indication that the co-owners desired to impose an equitable lien on loan proceeds disbursed by Broadmark Realty Capital's predecessor-in-interest pursuant to its loan agreements with Capitol Hill Subway. Rather, as discussed above, Hardy's and 12th and John Investors' desires were to enter into an investment and ownership agreement with one another and for Capitol Hill Subway to redeem 12th and John Investors' membership interest.

---

[28] Indeed, had the lenders therein viewed those writings prior to lending the builder such funds, it would have been clear that the deed in question was held in escrow as security for the builder's performance, rather than any other purpose, and that the lenders' mortgage interest in the deed would be inferior.

Moreover, the titles of the agreements in question neither mention the phrase "equitable lien," nor expressly—nor implicitly—indicate that the loan proceeds arising from Capitol Hill Subway's loan agreements with Broadmark Realty Capital's predecessor-in-interest were to be subject to an equitable lien. Rather, as discussed herein, the titles plainly describe writings regarding investment and ownership.

12th and John Investors does not provide any argument or analysis in support of how the titles, signatories, or objectives support a clear and unequivocal intent to create an equitable lien against the proceeds of Capitol Hill Subway's loan agreements made two years later with Broadmark Realty Capital's predecessor-in-interest. Indeed, no such unequivocal intent can reasonably be understood from the writings' titles, signatories, and objectives.[29]

ii

The terms and conditions of the writings in question also do not clearly and unequivocally evidence such an intent. As an initial, but significant, matter, there is no dispute that the co-owners' writings preceded any such loan refinance with Broadmark Realty Capital's predecessor-in-interest (from which the loan proceeds at issue were disbursed) by more than two years. It is therefore

---

[29] Furthermore, even if such an objective had been unequivocally expressed or implied in the writings in question, the dispute before us likely would not have arisen in the first instance. Indeed, as a matter of common business judgment, it is plain that, if Broadmark Realty Capital's predecessor-in-interest knew that its money would be diverted to the investment company, rather than devoted to those uses specified in the terms of its loan agreement with Capitol Hill Subway, then it would have very likely declined to make the loan.

Moreover, it would be difficult to envision that any member of 12th and John Investors would not be aware that no money would be loaned by a commercially viable company in such a circumstance.

unsurprising that nowhere do those writings expressly mention—or necessarily imply—that the co-owners had specifically contemplated creating an equitable lien against loan proceeds from Broadmark Realty Capital's predecessor-in-interest's loan agreements with Capitol Hill Subway that had yet to exist. Indeed, when the co-owners signed the writings in question, Trez Capital, not Broadmark Realty Capital's predecessor-in-interest, was the lender creditor with the most senior loan against in the development property.[30] Hence, 12th and John Investors plainly do not establish that the writings in question reflect that the co-owners unequivocally intended to subject the specific loan proceeds in question to an equitable lien in 12th and John Investors' benefit.

Furthermore, even if we were to find that 12th and John Investors' interpretation was plausible (which we do not), the writings' terms and conditions neither expressly indicate nor necessarily imply that the co-owners intended to create an equitable lien against the specific loan proceeds arising from Capitol Hill Subway's loan agreements with Broadmark Realty Capital's predecessor-in-interest. As an initial matter, the provisions at issue do not expressly indicate such an intent. Indeed, those provisions neither mention the phrase "equitable lien" nor do those provisions specifically mention Broadmark Realty Capital, its predecessor-in-interest, or a specific—future—loan agreement from which those loan proceeds might, in the future, be disbursed.

---

[30] Moreover, as discussed herein, around the time that the co-owners signed the writings in question, Broadmark Realty Capital's predecessor-in-interest had expressly rejected Capitol Hill Subway's request that it provide Capitol Hill Subway with a construction loan.

45

Furthermore, there is no *unequivocal* and *necessary* implication arising from the provisions at issue that the co-owners intended to create such an equitable lien. Notably, Broadmark Realty Capital's interpretation, analyzed above, is plainly a reasonable alternate interpretation of the provisions at issue. Again, that there exists another reasonable interpretation of those provisions is, by itself, fatal to 12th and John Investors' proposed equitable lien interpretation, which requires that there be only one possible interpretation—an unequivocal expression—in order for an equitable lien to be created. See Speirs, 143 Wash. at 301.

In addition, the other written consent and condition subsequent clauses in the co-owners' writings similarly do not evidence the requisite intent. Indeed, implicit in 12th and John Investors' interpretation is that the co-owners unequivocally intended that the clauses therein—the loan refinance written consent obligation clauses and the condition subsequent clauses—would be operationally distinct from other such provisions. However, the similarities between the clauses in question and those other clauses throughout the co-owners' writings do not reasonably support such an intention. Moreover, 12th and John Investors does not argue or present analysis in support of the proposition that the provisions in question should be interpreted any differently than the foregoing provisions.

Finally, the writings' dedicated default and remedy sections are plainly inconsistent with 12th and John Investors' proffered interpretation. As an initial matter, the existence of a default and remedy sections—in the same writings that

purport to contain provisions creating a remedy of an equitable lien—by itself suggests that other remedies were available and that an equitable lien was not the only possible interpretation—the result of an unequivocal expression—arising from the provisions in question.

Furthermore, the text of the dedicated default and remedies sections do not expressly indicate or necessarily imply that the co-owners intended to create the asserted equitable lien. The default sections do not set forth an exception for Capitol Hill Subway's default on its loan refinance written consent obligation, the remedies sections do not expressly indicate that such a default would result in a remedy specified elsewhere in the co-owners' writings, and the remedies sections also do not expressly identify an equitable lien as one of the remedies available to 12th and John Investors in the event of a default.

Nor, for that matter, do the remedies sections necessarily imply such an intent. Indeed, although the writings' remedies sections contain catch-all provisions reserving to 12th and John Investors all rights at law or in equity, such a reservation of rights plainly cannot constitute a clear and unequivocal intent to create such a *specific* security interest against *specific* property. Thus, the terms and conditions of the writings in question do not expressly indicate, or even necessarily imply, that the co-owners clearly and unequivocally intended for the provisions in question to create the equitable lien asserted herein.[31]

_____

[31] In its appellate briefing, 12th and John Investors asserts that Capitol Hill Subway's default on its loan refinance written consent obligation would result not in a default and the attendant remedies specified in their writings but, rather, would result in an equitable lien against the loan proceeds. Implicit in 12th and John Investors' interpretation is that the provisions themselves either expressly or implicitly provide for standalone default and remedy terms that apply only to the provisions in question. 12th and John Investors does not support this

iii

Nevertheless 12th and John Investors assert that the co-owners' writings' definition of the word "lien" supports its proffered interpretation. This is so, 12th and John Investors contends, because as defined therein, "lien" is given a definition so broad so as to establish that the co-owners intended that a default on Hardy's loan refinance written consent obligation would create the specific equitable lien in question.[32] Because such definition and characterization neither unequivocally reflect an intent to create an equitable lien on *specific* loan proceeds nor necessarily follow from as much, 12th and John Investors' assertion fails.

The Investment Agreement defined the term "lien" as

> *any* mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, *or any other* encumbrance, charge or transfer of, on or affecting [Capitol Hill Subway] and/or the Property, any portion thereof or any interest therein, including, without limitation, *any* conditional sale or other title retention agreement, *any* financing lease having substantially the same economic effect as *any* of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

(Emphasis added.)

---

implication with argument or analysis but, rather, merely asserts that it must be so. As discussed above, however, it is plainly a reasonable interpretation of the absence of specific default and remedy terms in the provisions in question that the co-owners intended for such terms to be incorporated in those provisions from the writings' dedicated—and broad—default and remedies sections.

12th and John Investors also asserts that such a reading would render the loan proceeds portion of the provisions at issue meaningless. To the contrary, as analyzed above, a commercially reasonable interpretation of the above provisions that gives meaning to each clause within those provisions—as well as the other provisions throughout the co-owners' writings—exists.

[32] Notably, despite the broad terminology detailed therein, the definition of "lien" does not include the phrase "equitable lien."

The writings' definition of "lien" does not set forth a clear and unequivocal intent to create the equitable lien in question. As an initial matter, such an intention does not arise by necessarily implication because a reasonable alternate interpretation of the co-owners' intention underlying its definition of lien exists. It seems plain that the definition of a word used in a contract is typically intended to define that word as it is used in the contract. And indeed, the word "lien" recurs throughout the co-owners' writings, with several provisions prohibiting Capitol Hill Subway from allowing "other encumbrances and/or liens," "any Lien," "contractor liens," or a "potential Environmental lien" to stand against the property in question or any portion thereof. Thus, a much more natural interpretation of such a provision—and one supported by the prevalence of the word "lien" elsewhere in the writings in question—is that the parties intended that the definition of "lien" in the Investment Agreement would define the word "lien" as it occurs throughout their writings.

Furthermore, as "lien" is defined therein, the definition provided is so broad so as to be incapable of both reasonably reflecting a clear and unequivocal intention to create an equitable lien by resort to those provisions of the writings in question or creating such a lien with the required specificity. Indeed, that the co-owners set forth the word "lien" elsewhere in the writings, but did not elect to use it to refer to an "equitable lien" in the provisions at issue, further cautions against reading such intent into the co-owners' writings. Thus, for the foregoing reasons, 12th and John Investors' assertion fails.

49

iv

Despite the several failings of 12th and John Investors' assertion, we nevertheless consider whether 12th and John Investors' conduct since signing the writings in question was consistent with its proffered interpretation that the provisions at issue unequivocally created an equitable lien. It was not.

As set forth above, the intent of the parties may be discerned from "'the subsequent acts and conduct of the parties to the contract.'" Healy, 15 Wn. App. 2d at 544-45 (internal quotation marks omitted) (quoting Tanner Elec. Coop., 128 Wn.2d at 674). Furthermore, once an equitable lien is created, "'it is, nevertheless, but a mere floating and ineffective equity until such time as a judgment or decree is rendered actually subjecting the property to the payment of the debt or claim.'" Nelson, 171 Wash. at 61 (quoting Langford v. Fanning, 7 S.W.2d 726, 728 (Mo. App. 1928)). Indeed, equitable liens are "'equitable' in the sense that they . . . are recognized and enforced in the courts of equity." DOBBS, supra, at 601.

Given that, in the event that the co-owners intended to create the equitable lien in question, it would be expected that 12th and John Investors would have immediately sought judicial relief under the co-owners' agreement in the event that Hardy refinanced Capitol Hill Subway's loan against the development property without 12th and John Investors' written consent.[33]

---

[33] Indeed, for 12th and John Investors to do otherwise, such as to adopt a wait-and-see approach, would be consistent not with 12th and John Investors' proposed interpretation but, rather, with Broadmark Realty Capital's proposed interpretation, previously discussed.

12th and John Investors' conduct during the time in question was plainly inconsistent with its now-asserted interpretation of the provisions at issue. For instance, when Hardy refinanced Capitol Hill Subway's property's loan with Broadmark Realty Capital's predecessor-in-interest without also obtaining 12th and John Investors' written consent to do so, 12th and John Investors did not act consistent with its preferred interpretation. Indeed, in response to any one of the instances in which Hardy purportedly refinanced a loan in question without obtaining the requisite consent, 12th and John Investors neither sought an injunction against the performance of the loan refinance agreement nor against the disbursement of such proceeds pursuant to that loan agreement. Moreover, when the proceeds from such agreements were to be disbursed, 12th and John Investors neither filed a claim in the trial court to avail itself of its purported right to an equitable lien on any such proceeds nor sought to stop any such disbursements from being utilized to pay for construction on the development project.

Furthermore, 12th and John Investors' notification of default letter to Capitol Hill Subway was also inconsistent with its proposed interpretation of the provisions at issue. Indeed, 12th and John Investors not only sent the letter eight months after Capitol Hill Subway's purported initial event of default, but also identified a default and remedy structure consistent with Broadmark Realty Capital's proffered interpretation of the writings in question, did not specify that it had the remedy of an equitable lien against certain loan proceeds, and after declaring such a default, did not seek to impose or enforce in court an equitable

51

lien against the loan proceeds in question. Nor, for that matter, was the default alleged therein Hardy's failure to obtain 12th and John Investors' written consent but, rather, it was Capitol Hill Subway's failure to redeem 12th and John Investors' interest by the August 2018 redemption date.

In addition, 12th and John Investors' litigation strategy was inconsistent with its proffered interpretation on appeal. As an initial matter, when 12th and John Investors decided that it would initiate litigation predicated on the terms of its agreement with Hardy, it did not sue Capitol Hill Subway for defaulting on the loan refinance written consent provisions but, rather, sued Hardy on his personal guarantee of 12th and John Investors' investment and return. Then, after that litigation was successful but resulted in the debt arising from the resulting judgment being discharged in bankruptcy, several individual members of 12th and John Investors again initiated legal action. However, those members did not sue Capitol Hill Subway under any theory related to its equitable lien but, rather, sued 12th and John Investors' former manager premised upon certain alleged breaches of fiduciary duties and tort claims.

Then, two and half years after the first assertedly improper loan refinance in question—and four years since the writings in question were signed—12th and John Investors initiated litigation against both Capitol Hill Subway and Broadmark Realty Capital and asserted that 12th and John Investors, along with Hardy, had intended to create an equitable lien. However, even that allegation was predicated on the creation of an equitable lien secured against the development property in question, not the loan proceeds now at issue.

It was not until summary judgment proceedings against Broadmark Realty Capital, in September 2022—six and a half years after the writings in question were signed—that 12th and John Investors advanced the contract interpretation that it now sets forth on appeal. Again, such a significant change years after the signing of the writings in question is a weighty consideration in determining whether a proposed interpretation of a writing is a reasonable one. See Long-Bell Lumber Co., 35 Wn.2d at 529. Given all of this, 12th and John Investors' conduct has been inconsistent with its proffered interpretation that the co-owners unequivocally intended to establish the equitable lien in question.

D

In summary, it is a reasonable interpretation of the provisions in question that the co-owners intended to condition Hardy's obligation to obtain 12th and John Investors' written consent for a loan refinance subsequent to Capitol Hill Subway's redemption of 12th and John Investors' membership interest in Capitol Hill Subway. The provisions of the co-owners' writings and subsequent conduct are clearly consistent with such an interpretation.

In contrast, it is plainly not a commercially reasonable interpretation of those writings that the co-owners intended to create an equitable lien against specific loan proceeds stemming from a loan refinance for which Hardy failed to obtain 12th and John Investors' written consent. In order to establish such a lien, the intent to do so must appear clearly and unequivocally in the writings in question. It must also identify specific property which will serve as security for such a lien. As discussed herein, 12th and John Investors' proposed

53

interpretation fails—in several ways—as to both of these requirements. Moreover, the existence of another commercially reasonable interpretation of the provisions in question renders 12th and John Investors' proposed interpretation inadequate to establish an equitable lien. The reasonableness of Broadmark Realty Capital's asserted interpretation of the writings demonstrates that 12th and John Investors' proposed interpretation is far from clear and unequivocal. To the contrary, the superiority of the interpretation urged by Broadmark Realty Capital plainly establishes that 12th and John Investors cannot establish the validity of its claim.

Accordingly, 12th and John Investors does not demonstrate an entitlement to appellate relief arising from its claims against Broadmark Realty Capital predicated on the co-owners' agreement amongst themselves.

III

12th and John Investors next asserts that the trial court erred by rejecting several theories in tort that, it avers, entitle it to appellate relief. None of its theories are availing.

A

12th and John Investors first asserts that Broadmark Realty Capital's predecessor-in-interest engaged in tortious interference with 12th and John Investors' business expectancy. This is so, 12th and John Investors contends, because it had a contractual expectation to be paid out of the proceeds of any loan refinance to which it had not given its written consent, and Broadmark

54

Realty Capital's predecessor-in-interest did not disburse such proceeds to 12th and John Investors.

To establish tortious interference with a contractual relationship or business expectancy, a plaintiff must prove five elements:

> "(1) [T]he existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage."

Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc., 169 Wn. App. 111, 132, 279 P.3d 487 (2012) (alteration in original) (quoting Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 157, 930 P.2d 288 (1997)).

12th and John Investors' claim fails. As an initial matter, 12th and John Investors does not identify with any particularity the business expectancy—and the underlying contractual provisions—upon which it predicates its claim. Rather, 12th and John Investors merely argues Broadmark Realty Capital's predecessor-in-interest interfered with its "contractual relationship with [Capitol Hill Subway] and business expectancies arising therefrom," including its "contractual right to be paid out of the loan proceeds." This is plainly an insufficient basis on which to assert the existence of a valid contractual relationship or business expectancy. We do not consider arguments unsupported by citation and analysis. RAP 10.3(a)(6); Saunders v. Lloyd's of London, 113 Wn.2d 330, 345, 779 P.2d 249 (1989).

Nonetheless, assuming that 12th and John Investors intended that its tortious interference assertion be predicated on its equitable lien theory discussed above, that theory also fails to establish the requisite business expectancy. As extensively analyzed herein, such an interpretation is neither a reasonable nor plausible interpretation of the writings in question. Indeed, those writings plainly do not reflect a clear and unequivocal intention to create a specific interest in the loan proceeds arising from such loan agreements. Huber, 30 Wn. App. at 808 (citing Redemptorist Fathers, 174 Wash. at 361; Beaulaurier, 16 Wn. App. at 889).

Moreover, even if the writings in question reasonably reflected that the parties therein were attempting to create an equitable lien against *any* future loan proceeds, such attempts would also fail. Indeed, an equitable lien is not only about creating a security interest in money. It is about creating a *specified* interest in *identifiable* money. Kinne, 27 Wn. App. at 162 (citing Monegan, 16 Wn. App. 287); Bonneville Power Admin., 956 F.2d at 1507. Given that, 12th and John Investors fails to establish the existence of the requisite business expectancy necessary to support its tortious interference claim.

Importantly, because no such business expectancy arose from the co-owners' writings, Broadmark Realty Capital's predecessor-in-interest cannot be charged with knowledge of an expectancy that, as discussed herein, does not exist. Finally, given the facts before us, Broadmark Realty Capital's predecessor-in-interest cannot be said to have engaged in any wrongful act by disbursing the loan proceeds in question in accordance with the performance

required under its loan agreements with Capitol Hill Subway. Thus, for several reasons, 12th and John Investors' tortious interference claim fails.

B

12th and John Investors next asserts that Broadmark Realty Capital's predecessor-in-interest received unjust enrichment at 12th and John Investors' expense. This is so, 12th and John Investors contends, because the lender's predecessor-in-interest received a portion of the loan proceeds pursuant to its agreement with Hardy, instead of disbursing such proceeds to 12th and John Investors.

Unjust enrichment is the method of recovery for the value of a benefit retained by another in the absence of any contractual relationship because notions of fairness and justice require it. Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008) (citing Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App. 151, 160, 810 P.2d 12 (1991)).

Unjust enrichment is measured by a defendant's gains, rather than a plaintiff's losses. See Dragt v. Dragt/DeTray, LLC, 139 Wn. App. 560, 576, 161 P.3d 473 (2007) (citing RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1 (2011)).

> [T]o recover for unjust enrichment the plaintiff must plead both unjust retaining of benefits and why an equitable remedy is necessary. It must allege all of the material facts that constitute the gist of the cause of action.

Puget Sound Sec. Patrol, Inc. v. Bates, 197 Wn. App. 461, 475, 389 P.3d 709 (2017) (footnotes omitted) (citing Hughes v. Chattem, Inc., 818 F.Supp.2d 1112,

57

1124-25 (S.D. Ind. 2011); 66 AM. JUR. 2D RESTITUTION AND IMPLIED CONTRACTS § 159 (2011)).

12th and John Investors' assertion fails. Again, the investment company does not identify with any specificity the basis from which arises its purported right to the benefit that Broadmark Realty Capital's predecessor-in-interest allegedly unjustly retained. Rather, 12th and John Investors merely argues that the loan proceeds in question were "due and owing" to it. Such an assertion is plainly insufficient to support the foundation of an unjust enrichment claim. Again, we do not consider arguments unsupported by citation and analysis. RAP 10.3(a)(6); Saunders, 113 Wn.2d at 345.

Nonetheless, assuming that the alleged benefit owing to 12th and John Investors' is again predicated on its proposed equitable lien interpretation, 12th and John Investors' reliance on such a theory, for the reasons mentioned above, fails. Huber, 30 Wn. App. at 808 (citing Redemptorist Fathers, 174 Wash. at 361; Beaulaurier, 16 Wn. App. at 889); Kinne, 27 Wn. App. at 162 (citing Monegan, 16 Wn. App. at 287); Bonneville Power Admin., 956 F.2d at 1507. Therefore, by relying on an implausible interpretation of the writings in question as the foundation for the creation of an equitable lien and by failing to present agreements identifying the specific property upon which such a lien would be impressed, 12th and John Investors' claim twice falls short of establishing a right to appellate relief.

Furthermore, even if 12th and John Investors had established its equitable lien theory (which, again, it has not), the investment company has failed to allege

58

all of the material facts that might constitute the gist of such a cause of action. According to 12th and John Investors, Broadmark Realty Capital's predecessor-in-interest's alleged "gains" were the sums that it received for performance of its contracts with Capitol Hill Subway. In attempting to establish unjust enrichment, however, 12th and John Investors never made such gains its target. Rather, all 12th and John Investors attempts to do is establish proof of its *losses*. Given that, 12th and John Investors did not provide us, or the trial court, with evidence that Broadmark Realty Capital's predecessor-in-interest received gains—nevermind unjust gains—greater than that to which they were entitled by performing its contractual obligation with a party other than 12th and John Investors.[34]

Thus, 12th and John Investors' tort claims against Broadmark Realty Capital fail. Accordingly, 12th and John Investors does not establish an entitlement to appellate relief.[35]

---

[34] 12th and John Investors also asserts that Broadmark Realty Capital's predecessor-in-interest engaged in conversion of its property by disbursing the loan proceeds in question to Capitol Hill Subway and to itself, pursuant to the terms of the loan agreements in question, rather than disbursing such proceeds directly to 12th and John Investors. This was conversion, according to the investment company, because 12th and John Investors had an equitable lien on such loan proceeds which, it alleges, created a property right in such loan proceeds.

12th and John Investors' assertion is incorrect. Almost one century ago, our Supreme Court expressly rejected the predicate for that assertion:

"An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. . . . It is neither a debt nor a right of property" . . . .

. . . .

*It seems to be sustained by practically universal authority that an equitable title or right is not enough to support an action for conversion.*

Nelson, 171 Wash. at 61, 63-64 (emphasis added) (quoting Kukuk v. Martin, 331 Ill. 602, 605, 163 N.E. 391 (1928)). Accordingly, 12th and John Investors' claim fails.

[35] Given our disposition of this matter on the foregoing bases, we need not consider 12th and John Investors' remaining assertions.

The trial court's grant of summary judgment to Broadmark Realty Capital is affirmed. The trial court's denial of 12th and John Investors' motion for summary judgment is also affirmed.

Dwyer, J.

WE CONCUR:

Feldman, J.          Birk, J.